UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

CV. 23-3378 (KM)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM NO. 18-21(KM) |
| Plaintiff, | : | |
| v. | : | NOTICE OF MOTION TO VACATE, SET-ASIDE |
| | : | OR CORRECT A SENTENCE PURSUANT TO |
| JESSIE TULLIES | : | 28 U.S.C. § 2255 |
| Defendant. | : | |

TO:    Francisco Navarro
        Assistant United States Attorney
        United States Attorney's Office
        970 Broad Street
        Newark, NJ 07102

        Elaine K. Lou
        Assistant United States Attorney
        United States Attorney's Office
        970 broad Street
        Newark, NJ 07102

        PLEASE TAKE NOTICE that defendant, Jesse tullies, through his attorney, John J.

McMahon, Esq., will move before the Honorable Kevin McNulty, United States District Judge

for the District of New Jersey, in Newark, New Jersey, on a date and time to be set by the Court,

for the following relief:

   A.  To vacate, set-aside, or correct a sentence pursuant to 28 U.S.C. § 2255

                                        Respectfully submitted,

                                        s/ John J. McMahon
                                        John J. McMahon, Esq.
                                        Attorney for Jesse Tullies

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM NO. 18-21(KM) |
| Plaintiff, | : | |
| v. | : | ORDER |
| | : | |
| JESSIE TULLIES | : | |
| Defendant. | : | |

THIS MATTER having come before the Court on the motion of the Defendant, Jesse Tullies, by his attorney, John J. McMahon, Esq. for an Order granting defendant certain relief, and the government having being heard, and the Court having considered the arguments of counsel, and for good cause shown;

IT IS on this _____ day of _____ 2023

HEREBY ORDERED that defendant, Jesse, Tullies, sentence be _____ pursuant to 28 U.S.C. 2255.

_____
Hon. Kevin McNulty, U.S.D.J.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | Cr. No. 18-21(KM) |
| v. | : | |
| **JESSE TULLIES,** | : | |
| | | Hon. Kevin McNulty, U.S.D.J. |
| | : | |
| | : | |

---

**DEFENDANT BRIEF IN SUPPORT OF MOTION TO VACATE, SET-ASIDE OR CORRECT A SENTENCE PURSUANT TO 28 U.S.C. § 2255 AND APPENDIX (pp. 1-19)**

---

**JOHN J. MCMAHON, ESQ.**
Attorney ID 038111989
80 Main Street, Suite 580
West Orange, N.J. 07052
973-761-2210-
jmc@jjmcmahonlaw.com

*Of counsel and On the Brief*

Defendant Is Confined

**TABLE OF CONTENTS**

PAGE NOS.

PROCEDURAL AND FACTUAL BACKGROUND..............................1

I.    STANDARD OF REVIEW.......................................7

II.   LEGAL ARGUMENT: PETITIONER TULLIES WAS DENIED THE
      EFFECTIVE ASSISTANCE OF COUNSEL IN THIS CASE...........10

      Ground 1:Defense Counsel Should Not Have Called
      Dina Blackwell As a Witness Because Her
      Testimony Was Devastating to Tullie's
      Defense................................................11

      Ground 2:If The Calling Of Dina Blackwell As
      A Witness Did Not Render Counsel
      Ineffective, His Failure To Salvage
      Her Credibility By Calling The Investigator
      That He claimed Was With Her Resulted
      In Ineffective Assistance of
      Counsel................................................22

      Ground 3:The Testimony Of FBI Agent John Havens, Jr.,
      Appearing As An Expert For the Government, Should Have
      Been Objected To And Deemed Inadmissible Because It
      Directly Commented On The Mens Rea Of The Defendants In
      Violation of F.R.E. 704(b).............................25

      Ground 4:Defense Counsel's Erroneous View Of The Law And
      Trial Practice Resulted In His Ineffective Representation
      Of Defendant Tullies When He Failed To Use Defendant's
      Phone Records To Dispute The Claims Of The Law
      Enforcement Witnesses .................................29

      Ground 5:Defense Counsel Failed To Request That Obvious
      Jencks Materials Be Provided To The
      Defense................................................31

      Ground 6: The Cumulative Effect Of Counsel's Failures
      Establishes Prejudice.................................34

III. REQUEST FOR AN EVIDENTIARY HEARING.....................35

CONCLUSION....................................................36

i

# TABLE OF AUTHORITIES

**CASES:**

*Brady v. Maryland*, 373 U.S. 83, 87 (1963) ...............................................32

*Blackledge v. Allison*, 431 U.S. 63, 74 n.4 (1977) ...................................7

*Carpenter v. Vaughn,* 888 F. Supp. 635, 654 (M.D. Pa. 1994)

.......................................................................................................................23, 24

*Clay v. United States*, 537 U.S. 522, 525 (2003)............................................2

*Edwards v. Vannoy*, 141 S.Ct. 1547 (2021)....................................................2

*Giglio v. United States,* 405 U.S. 150, 154 (1972) ...................................32

*Jencks v. United States*, 353 U.S. 657 (1957) ...........................................32

*Kaufman v. United States,* 394 U.S. 217, 227 n.8 (1969).......................8

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)....................27

*Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995) ...........................................32

*Massaro v. United States,* 538 U.S. 500, 504 (2003) ........................8, 9

*Miller v. United States,* 261 F.2d 546, 547 (4th Cir. 1958)..............7

*Sanders v. United States,* 373 U.S. 1, 19 (1963) ....................................35

*State v. Watson*, 260 F.3d 301, 308 (3d Cir. 2001) ....................28, 29

*Strickland v. Washington*, 466 U.S. 668, 687-88

(1984)..................................................................9, 10, 11, 20, 22, 25, 30, 31

*Wall v. Kholi,* 562 U.S. 545, 551-52 (2011) ..........................................8

*United States v. Basham,* 561 F.3d 302, 330 (4th Cir. 2009) .........34

*United States v. DeRewal,* 10 F.3d 100, 105 n.4 (3d Cir.

1993)..................................................................................................................8, 9

*United States v. Frady*, 456 U.S. 152, 165 (1982) ..............................8, 9

*United States v. Griffith*, 118 F. 3d 318, 321 (5th Cir. 1997)...27

*United States v. Martinez,* 277 F.3d 517, 532 (4th Cir. 2002)......35

*United States v. Mitchell*, 302 U.S. App. 153, 996 F.2d 419, 422

(D.C. Cir. 1993) .................................................................................................................28

*United States v. Nahodil,* 36 F.3d 323, 326 (3d Cir. 1994)..............9

*United States v. Orejuela, 639 F.3d 1055, 1057 (3d Cir. 1981)*...8

*United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990)...35

*United States v. Robinson*, 562 Fed. Appx. 72 (3d Cir. 2014)......29

*United States v. Russell*, 34 Fed. Appx. 927, 928 (4th Cir. 2002

.............................................................................................................................................35

*United States v. Travillion,* 759 F.3d 281, 288 (3d Cir.

2014).....................................................................................................................................8

*United States v. Underwood*, 246 Fed. Appx. 92 (3d Cir. 2007) ...29

**STATUTES:**

18 U.S.C. § 922(g)(1)......................................................................................................1

18 U.S.C. § 924(c)(1)(A)...............................................................................................1

18 U.S.C. § 3500......................................................................................................32, 33, 24

21 U.S.C. § 846..................................................................................................................1

21 U.S.C. § 846(a)............................................................................................................1

21 U.S.C. § 846(b)(1)(C)...................................................................................................1

28 U.S.C. § 2255.........................................................................7, 8, 9, 10, 11, 35

28 U.S.C. § 2255(a).........................................................................7, 22, 25, 31

28 U.S.C. § 2255(f)(1)...................................................................................................1


**RULES:**

*Sup. Ct. R.* 13.3...................................................................................................2, 7

*F.R.E.* 702...................................................................................................27

*F.R.E.* 704...................................................................................................28

*F.R.E.* 704(b)...................................................................................25, 27, 28

*F.R.E.* 803(6)...................................................................................................30


**OTHER AUTHORITIES:**

Black's Law Dictionary 298 (9th ed. 2009)...................................................................................................8

## PROCEDURAL AND FACTUAL BACKGROUND

Jesse Tullies was convicted in the United States District Court for New Jersey, after a trial, of conspiracy to distribute heroin in violation of 21 U.S.C. § 846; distribution of heroin, in violation of 21 U.S.C. § § 841(a), (b)(1)(C); possession with intent to distribute crack, in violation of 21 U.S.C. § 841(b)(1)(C); possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1); and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).[1] *United States v. Jesse Tullies*, Criminal No. 2:18-cr-21-01 (KM). On August 19, 2019, defendant Tullies was sentenced to an aggregate term of 235 months.

On August 23, 2019, the defendant filed a timely Notice of Appeal with the clerk of the district court from the final order of judgment issued in this case. Mr. Tullies's convictions and sentence were affirmed by the United States Court of Appeals for the Third Circuit on February 10, 2022. *United States v. Tullies and United States v. Williams*, Nos. 19-2957 and 19-2976. No petition for *certiorari* was thereafter filed with the Supreme Court. This petition is timely in that it is filed within one year and 90 days of the affirmance by the Third Circuit. *See* 28 U.S.C. § 2255 (f)(1) (a "one year period of limitation shall apply to a

---

[1] Codefendant Eugene Williams was similarly charged and convicted.

1

motion under this section. The limitation period shall run from …
the date on which the judgment of conviction becomes final"); *see,
also, Edwards v. Vannoy,* 141 S.Ct. 1547 (2021) ("Everyone accepts
that, in our criminal justice system today, a judgment becomes
final only after the completion of a trial and the appellate
process, including the opportunity to seek certiorari from this
Court on questions of federal law"); *Clay v. United States,* 537
U.S. 522, 525 (2003) ("a judgment of conviction becomes final when
the time expires for filing a petition for certiorari contesting
the appellate court's affirmation of the conviction"); Sup. Ct. R.
13.3 (*certiorari* petition must be filed within 90 days after the
entry of the judgment).[2]

At trial Detective Yusef Ellis and his colleagues at the Essex
County Sheriff's Office testified that the two defendants were
observed selling heroin on Weequahic Avenue near Clinton Place in
Newark, New Jersey, to John Potts and an unidentified woman. Upon
arrest, law enforcement officers searched a car that was across
the street from the alleged drug sales and the officers found
heroin, crack cocaine and three loaded 9-millimeter handguns.

As the trial court noted in its opinion denying the joint
motions for a judgment of acquittal or in the alternative for a

---

[2]The due date for this petition to be timely is May 14, 2023.

new trial, the facts gleaned from the government's case were as follows:

> The charges stemmed from the events of a single afternoon, October 4, 2017. An undercover officer saw the defendants engage in two sales of illegal narcotics. The officers apprehended one customer in possession of the heroin he had just purchased. They seized heroin and crack cocaine, as well as three loaded handguns, from a parked car that defendants used as a stash.

(Motion opinion p. 1)

Detective Ellis identified the defendants as two men who were involved in the hand-to-hand narcotics transactions. He saw the transactions while conducting surveillance from an unmarked car. (Tr. 158) Det. Ellis testified that he saw a white male (later identified as John Potts) pull up in a green Honda Civic and speak with Tullies. (Tr. 159-60) Williams then crossed the street and went to a Chevy Lumina parked at 249 Weequahic Avenue. (Tr. 161-63) From the rear bumper of the Lumina, Williams retrieved a clear plastic bag, removed some items and then returned the bag under the car. (Tr. 164-65) Williams walked back across the street and handed the items to Tullies. Ellis claimed that he could see that the items were glassine folds, commonly used to package heroin. (Tr. 166) Ellis testified that Tullies handed the items to the driver of the Civic in return for cash. (Tr. 166-67)

3

A second transaction occurred when an unidentified woman approached Tullies on foot. (Tr. 170-71) According to Ellis, this time Tullies went to the Lumina just as Williams had done earlier. (Tr. 171) Tullies reached under the rear bumper of the car, pulled out a plastic bag, removed items from that bag and put it back under the bumper. (Tr. 172) Tullies crossed the street again and returned to the unidentified woman. (Tr. 173) Ellis said that he could see that Tullies had glassine folds in his hand, which he gave to the woman in return for cash. (Tr. 174)

Ellis summoned the backup officers, and Detectives Evans and Pearce appeared and arrested defendants Tullies and Williams. (Tr. 178) The officers found Tullies to be in possession of $1275; Williams had $360. (Tr. 252-58)

The unidentified woman was never found, but John Potts, the driver of the green Civic, was stopped nearby. (Tr. 175-76; Tr. 304, 306) The officers seized two glassine envelopes of heroin, marked "Black Jack," from Potts. (Tr. 309-11) Detective Docke reported the results of the stop to Ellis, and then he brought Potts back to the location of the drug sale. (Tr. 176-77; Tr. 311)

Ellis directed Detectives Ryals and Docke to search the Lumina. (Tr. 178-79)

> Together they searched the Lumina and the surrounding area. (Tr. 235) From under the rear bumper of the car, Ryals personally recovered "jugs" (small plastic containers) of crack cocaine and a loaded handgun with

4

> ammunition. (Tr. 236-43, 317-18) Detective
> Docke recovered from under the bumper a bag
> containing glassine envelopes of heroin,
> rubber-banded in bundles of ten, and stamped
> with the brand name "Black Jack." (Tr. 234-
> 47, 313-16) The brand-stamp "Black Jack"
> matched the stamp on the two envelopes seized
> from Potts. (Tr. 259-60) Docke also recovered
> from under the bumper two additional loaded
> handguns. (Tr. 247-52, 316-17)

(Motion opinion p. 3)

FBI Agent John Havens, Jr., testified as an expert in "methods used by drug dealers to conduct street-level drug business to include the distribution, packaging, pricing, and storage of the drugs, and also the use of firearms in furtherance thereof." (Tr. 382) He told the jury that everything that the law enforcement agents testified to comported with normal drug transactions.

Several witnesses testified for the defense. Leanna Travers, defendant Tullies's daughter, testified that on the day in question she and her friend, Stephanie Davis, drove to Weequahic Avenue to meet Tullies so that he could give her money to buy work shoes. (Tr. 44-45, 449) Leanna Travers was parked and still in her car when she saw her father pull up in a car, get out, and go over to another car to speak with a couple of women who were inside; he then walked over to Travers's car. At that moment the police arrived and blocked everyone in. (Tr. 445) Her father Tullies was handcuffed and arrested. (Tr. 446)

Stephanie Davis testified consistent with the testimony of her friend Leanna Travers. She too noted that very soon after Tullies arrived at the scene the police swarmed in and arrested him. (Tr. 437-39) On cross-examination Davis agreed that they had gone to Weequahic Avenue to see Tullies because that is where he usually hangs out. (Tr. 442)

The drug buyer John Potts, who was arrested along with Tullies and Williams, admitted that he went to Weequahic Avenue on October 4, 2017, to buy drugs. (Tr. 451) He testified that the people who sold the drugs to him were not Tullies and Williams, but rather they were "younger kids," whom he described as skinny black males between the ages of 18 and 20 years old. (Tr. 452-53)

Dina Blackwell, who had known defendant Tullies for over 20 years and is engaged to him, testified that the $1275 found in Tullies's possession at the time of his arrest was intended for a rental deposit on an apartment in Irvington. She first testified that although she had seen Potts in municipal court related to the charges in this matter, she did not have a conversation with him. (Tr. 484-87) However, during cross-examination it was revealed that Tullies urged Blackwell to contact the witness Potts online, which she did. He told her to attend Potts's court appearances and speak to Potts about the case, to "write up what John Potts should say," and to get a photo of Potts's identification. (Tr. 492-93) As the trial court has noted, "Having first testified that 'I never

6

spoke to Mr. Potts' (Tr. 493), Dina Blackwell then admitted that, at the 'first [court appearance] when they all got arrested,' she 'pulled [Potts] aside,' that she 'spoke to him outside,' and that he gave his contact information to her daughter, Amaya Smith. (Tr. 493-94)" (Motion opinion p. 6, n. 5)

Ultimately, the jury convicted both defendants of all charges.

## I. **STANDARD OF REVIEW**

Jesse Tullies is a federal prisoner in custody. As such, he may collaterally attack his sentence or conviction by moving the district court "to vacate, set aside, or correct the sentence." 28 U.S.C. § 2255(a). To obtain relief, a petitioner must prove his or her sentence or conviction was "imposed in violation of the Constitution or laws of the United States," that the district court "was without jurisdiction to impose such sentence," that the sentence exceeds "the maximum authorized by law," or that the sentence or conviction is "otherwise subject to collateral attack." *Id*. A petitioner must prove the asserted grounds for relief by a preponderance of the evidence. *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958). Because a § 2255 motion "is ordinarily presented to the judge who presided at the original conviction and sentencing[,] . . . the judge's recollection of the events at issue" may inform the resolution of the motion. *Blackledge v. Allison*, 431 U.S. 63, 74 n.4 (1977).

Section 2255 permits a federal prisoner to collaterally attack his or her conviction and/or sentence, but the grounds for such a motion are narrow. *See* 28 U.S.C. § 2255; *see also Wall v. Kholi*, 562 U.S. 545, 551-52 (2011) ("By definition . . . [a] 'collateral attack' is '[a]n attack on a judgment in a proceeding other than a direct appeal.'" (second alteration in original) (quoting Black's Law Dictionary 298 (9th ed. 2009))). A § 2255 motion does not function as a second appeal, *see United States v. Frady*, 456 U.S. 152, 165 (1982), and thus it does not ordinarily allow for re-review of issues raised on direct appeal. *See*, *e.g.*, *United States v. Travillion*, 759 F.3d 281, 288 (3d Cir. 2014); *United States v. Orejuela*, 639 F.2d 1055, 1057 (3d Cir. 1981); *see also Kaufman v. United States*, 394 U.S. 217, 227 n.8 (1969) ("Where a trial or appellate court has determined the federal prisoner's claim, discretion may in a proper case be exercised against the grant of a § 2255 hearing"). At the same time, many claims not raised on direct appeal cannot ordinarily be reviewed under § 2255. *See*, *e.g.*, *Massaro v. United States*, 538 U.S. 500, 504 (2003); *Travillion*, 759 F.3d at 288 n.11; United States v. *DeRewal*, 10 F.3d 100, 105 n.4 (3d Cir. 1993).

With limited exceptions, a petitioner advancing new claims asserted for the first time in a § 2255 motion "must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. at 166. The "high hurdle" applies

8

because, once a petitioner's opportunity to pursue a direct appeal has been waived or exhausted, there is "a final judgment [that] commands respect." *Id.* at 165-66.

However, those restrictions which limit the issues that may be raised in a petition pursuant to § 2255 do not apply to claims of ineffective assistance of counsel. Precedent has long recognized that "[a] § 2255 motion is a proper and indeed the preferred vehicle for a federal prisoner to allege ineffective assistance of counsel." *United States v. Nahodil*, 36 F.3d 323, 326 (3d Cir. 1994) (citations omitted); *see also Massaro*, 538 U.S. at 504 (permitting the raising of ineffective assistance of counsel claims on collateral review even when they could have been raised on direct review but were not); *DeRewal*, 10 F.3d at 105 (holding that a § 2255 petitioner is "not required to show 'cause and prejudice' with respect to his failure to raise his ineffective assistance of counsel claim on direct appeal," and suggesting that a § 2255 motion is ordinarily the proper vehicle for an ineffective-assistance claim).

To obtain relief based on an allegation of ineffective assistance of counsel, a petitioner must establish both: (1) that counsel's performance was so deficient that it fell below an objective standard of reasonableness; and (2) that counsel's inadequate performance resulted in prejudice to the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Satisfying

the **first** prong of *Strickland* requires a showing that counsel "made errors so serious that [they were] not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment." *Id.* at 687. The **second** prong of *Strickland* requires a petitioner to "affirmatively prove prejudice," which requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 693-94. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

## II. **LEGAL ARGUMENT**

### **PETITIONER TULLIES WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN THIS CASE.**

As explained above, under 28 U.S.C. § 2255, an individual in federal custody who seeks to be released upon "the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." A defendant is entitled to assistance of counsel whose performance does not fall below a minimum level of effectiveness. Assistance of counsel is ineffective if: (1) counsel fails to exercise the customary skill and diligence that a reasonably competent attorney would have employed under the same set of circumstances; and (2) the

ineffectiveness prejudiced the defendant. *Strickland v. Washington*, 466 U.S. at 687. Mr. Tullies files this petition under 28 U.S.C. § 2255, asserting multiple grounds that defense trial counsel was ineffective.

**Ground 1: Defense Counsel Should Not Have Called Dina Blackwell As A Witness Because Her Testimony Was Devastating To Tullies's Defense.**

The government's case in this matter revolved around the testimony of the law enforcement officers involved in the surveillance and subsequent arrests of the defendants. The Third Circuit very briefly summarized the government's case: "Detective Yusef Ellis and his colleagues at the Essex County Sherriff's Office arrested Defendants after observing them sell heroin in Newark, New Jersey, to John Potts and an unidentified woman. On arrest, law enforcement searched Tullies and Williams' car[3] and found significant amounts of crack cocaine and heroin along with three loaded 9-millimeter handguns." *United States v. Tullies*, 2022 U.S.App.LEXIS 3655, at 1-2 (3d Cir. 2022).

The defense called into question the veracity of law-enforcement witnesses. Leanna Travers (Tullies's daughter) and Stephanie Davis (Travers's friend) both testified that they were on the scene waiting to meet with Tullies, but as soon as he pulled up in a car, he was swarmed by law enforcement and arrested. (Tr.

---

[3] The Chevy Lumina which was searched did not belong to either Jesse Tullies or Eugene Williams.

435-39; Tr. 442-46) Since Tullies was arrested as soon as he arrived at the scene, he could not have been selling drugs there.

Most importantly, the drug buyer John Potts testified that the people who sold him the drugs (which matched those drugs found in the stash of drugs contained under the bumper of the Lumina) were **not** Jesse Tullies and/or Eugene Williams. Rather, the sellers of the drugs that Potts bought were "younger kids," who were skinny, approximately six feet tall and between 18 and 20 years old. (Tr. 452-53)

On cross-examination, the government repeatedly asked about any contact that Potts had with the defendants and their families, most notably Tullies's fiancé, Dina Blackwell. Initially, Potts testified that he had not spoken with any of Tullies's family members or friends. (Tr. 457) But later he noted that he had met Dina Blackwell one time at the courthouse when he was answering for the drug-possession charge against him. (Tr. 470) The cross-examination continued:

> Q. Now, you said that she showed up at your court date. How did she know to show up at your court date?
>
> A. I have no idea.
>
> Q. And she actually – she told you that she tried to contact you via Facebook; isn't that right?
>
> A. Not that I remember.

> Q. But she - so she just showed up on your
> court date?
>
> A. I guess.
>
> Q. She showed up at your court appearance more
> than once, right?
>
> A. No.
>
> Q. Just once?
>
> A. Yeah.
>
> Q. Was she by herself?
>
> A. I believe so.

(Tr. 472) Potts repeatedly stated that he did not "remember the conversation quite well." (Tr. 473) He did not think that he gave her his phone number. (Tr. 474) When the U. S. Attorney said: "You didn't tell anyone on the planet that these defendants didn't sell you the drugs until after you spoke to Mr. Tullies' friend; is that right?" Potts answered, "Yeah." (Tr. 474)

Counsel for Tullies then asked Potts whether a defense investigator was also there with Ms. Blackwell. Potts responded, "Oh, yes, that was the second time. The second time that I – that was at the - the court date where I got the community service." (Tr. 477-78) That examination continued:

> Q. And my investigator spoke with you and your
> lawyer with regard to your testimony here
> today, correct?
>
> A. Correct.

13

Q. Dina Blackwell wasn't present for that discussion, was she?

A. No. It was just the investigators and my lawyer and me.

. . .

Q. Did she talk to you about the case at all?

A. The investigators talked to me about the case.

Q. Are you absolutely sure that my client did not sell you drugs on October 4?

. . .

A. 100 percent sure.

(Tr. 478-79)

By the end of Potts's testimony the fact remained -- the man who bought the drugs in question did not waiver in his testimony that Tullies and Williams did not sell him those drugs. The trial testimony should have ended there. The jury should have decided the case based on all of the evidence presented up to that point. But instead, James R. Murphy, Esq., provided ineffective assistance of counsel to defendant Tullies by calling Dina Blackwell to the stand.

Dina Blackwell testified that she had known Jesse Tullies for over 22 years and that he is her fiancé. (Tr. 485) Blackwell testified in order to explain why Tullies was in possession of $1,275 when he was arrested: "I called him to come pick the money

up because we was putting a deposit down on a house in Irvington on Grant Place." (Tr. 486)

Blackwell also explained why she went to Newark Municipal Court on the day that she saw John Potts. "I received a summons in the mail with his name on it. I wanted to make sure they know he's incarcerated so he wouldn't receive a bench warrant." (Tr. 486) She did not see Potts that day in municipal court. However, she went there a second time with an investigator for defense counsel and she saw Potts at that time. Just as Potts had testified earlier, Blackwell said that she did not have a conversation with Potts. (Tr. 487)

At sidebar, the U.S. Attorney advised the court that he intended to cross-examine the witness regarding the many jail phone calls she had with defendant Tullies. (Tr. 488-89) Defense counsel noted that Tullies "calls her probably 20 times a day, so probably about 700 calls." (Tr. 489) When asked by the U.S. Attorney on cross-examination if she has had more than 1,000 phone conversations with Tullies since his arrest, Blackwell responded, "Probably so. He calls." (Tr. 491)

Blackwell went on to say that she also had a few phone conversations with co-defendant Williams, and she "helped arrange a conversation between the two of them." (Tr. 491) Her cross-examination continued:

15

Q. In those perhaps thousands of conversa-
tions that you've had with Mr. Tullies, he
asked you to find John Potts, didn't he?

A. Yes.

Q. He asked you to search for him online?

A. Yes.

Q. He asked you to send John Potts a Facebook
message?

A. Yes.

Q. And you did send him a Facebook message?

A. I believe I did.

Q. He asked you to go to John Potts' court
appearances.

A. He said he – that he tell him come to court,
but I received a letter from the court saying
he was going to be in court.

Q. I understand that you received a letter,
ma'am, but I'm asking you, Mr. Tullies also
asked you to go to John Potts' court
appearance; isn't that right?

A. Yes.

Q. He asked you to go to the court appearances
and speak to him about this case, right?

A. Yes.

Q. And he asked you to do all of these things
multiple times?

A. Yes.

Q. On his behalf?

A. Yes.

Q. And he asked you to write up what John Potts should say, right?

A. Yes.

Q. He asked you to take a photo, to get John Potts' identification, and take a photo of it, didn't he?

A. Yes.

Q. And so you did, in fact, go to the court appearances multiple times and speak to Mr. Potts?

A. I never spoke to Mr. Potts.

Q. You never spoke to Mr. Potts?

A. No.

Q. You did pull him aside, though, right?

A. When we first went to court the first time, when he was on [sic] the Municipal Court, not the second one - the first one when they all got arrested, I did go to court then.

Q. And you did pull him aside?

A. Yes.

Q. And he gave you his phone number?

A. No, he didn't give me his phone number that time.

Q. Did he give you contact information?

A. He - I spoke to him outside. He actually gave it to my daughter. He didn't give it to me.

Q. But - so - but when you pulled him aside, you spoke to him, it was just the two of you at that moment?

17

A. Me, myself and my daughter.

(Tr. 492-94)

A review of Dina Blackwell's testimony reveals only a single possible benefit to the defendant — she explained that she had given him the $1,275 that he had in his possession; ergo, that money was not the proceeds of drug sales. However, even that part of Blackwell's testimony was of little help to defendant Tullies. Given her long relationship and engagement to Tullies, her credibility was suspect. The U.S. Attorney certainly pointed that out to the jury via his cross-examination about (1) how much she cared for Tullies; (2) her love for him; (3) her desire that he not be incarcerated; and (4) the leading question, "[a]nd fair to say you'd do anything you could to help keep him out of jail," to which she responded "Yes." (Tr. 490)

Further, her testimony did not match up with the testimony of his daughter Leanna Travers. Blackwell said that she gave Tullies exactly $1,275 which he was to use as a deposit on a rental property. But Travers said that she went to the scene of the arrest to meet Tullies so that he could give her money for work shoes. As the U.S. Attorney emphasized in his summation, the jury was left to wonder where the extra money for the shoes would have come from

18

if all of the money that Blackwell said that she gave to Tullies was supposed to go towards the rental deposit.[4]

Defense counsel's calling of Dina Blackwell to the witness stand provided at most some negligible benefit to Tullies regarding the money that he had in his possession. But per his comment at sidebar, it is clear that defense counsel was aware that while Tullies was in jail on the instant charges, Blackwell had spoken to him through recorded jail calls "probably 20 times a day." (Tr. 489) Hearing the content of those conversations, any competent defense attorney would know that the overall impact of Blackwell's testimony would be devastating to the defense. The cross-examination regarding those recorded conversations could only lead the jury to conclude that Tullies was trying to manipulate Potts to provide untruthful testimony to aid the defense. If, on the other hand, counsel knew about those phone calls but failed to listen to them, his ineffectiveness would be even more evident.[5]

---

[4] The U.S. Attorney told the jury: "When you marry up [Blackwell's] testimony with Mr. Tullies' daughter, it simply doesn't ring true. It doesn't pass the smell test.

"She's [sic] bringing – the daughter said $75 for sneakers. You remember that? Miss Blackwell said it was $1,275 for rent, together, that's more than the 1,275 he had. He didn't have enough money to do both, the sneakers and the rent. Doesn't add up." (Tr. 518-19)

[5] According to the affidavit Dina Blackwell signed in connection with this motion, before testifying she "was never prepared by Mr. Murphy. I was never asked to meet him at his office nor did he ever come to my home or seek to meet me at my location." The only time Blackwell spoke with Murphy was at the courthouse, just prior to taking the witness stand. She was "never advised … as to what

It is submitted that in this case, defense counsel Murphy failed to exercise the customary skill and diligence that a reasonably competent attorney would have employed under the same set of circumstances. *Strickland v. Washington*, 466 U.S. at 687 (Prong One). No competent defense attorney would have called Dina Blackwell to the witness stand knowing the content of those phone calls.

Turning to the impact of trial counsel's ineffectiveness, it is recognized that to be successful on this application defendant Tullies must show that the ineffectiveness of his attorney prejudiced him. *Strickland v. Washington*, 466 U.S. at 687 (Prong Two). A review of the transcripts in this case up until the testimony of the last witness (Blackwell) shows a viable defense; adding that last witness's testimony smothered that defense. This Court has even noted the impact of Blackwell's testimony: "It was fair to point out on cross-examination that Potts's exculpatory testimony occurred after he learned that the defendants were accused of being armed drug dealers, and after he had been approached, inferably on Tullies's behalf, by Dina Blackwell." (Motion opinion p. 17) (emphasis added)

---

cross-examination would occur nor that I would be questioned about prior conversations with Mr. Tullies." "In summary, Mr. Murphy called me as a defense witness without any preparation." (Defendant Motion Appendix 1)

In its opinion on the defendant's motion for a judgment of acquittal or in the alternative for a new trial, this Court discussed the strength of the evidence against the defendants. The Court spoke of Blackwell's testimony as lending support to the government's case rather than the defendants:

> Dina Blackwell, who identified Tullies as her fiancé, testified in a manner that would have permitted the jury to infer that she had put tacit pressure on Potts. She admitted to speaking to both defendants since their arrest and arranging conference calls between them. She admitted on cross-examination that Tullies asked her to find Potts and contact him online, and that he directed her "multiple times" to attend Potts's court appearances and speak to him about the case. She admitted that Tullies directed her to "write up what John Potts should say," and directed her to take a photo of John Potts's identification. Still, she said initially, she "never spoke to Mr. Potts." She also testified that she did not see Potts at an initial municipal court appearance, but only at a second one, in the company of an investigator. (Tr. 486-87) Confusingly, she backtracked, admitting that at his first court appearance, she "pulled Potts aside" and spoke to him outside of court in the company of her daughter, to whom he gave his contact information. (Tr. 493-94)
>
> The evidence of guilt, then, was quite strong, and the testimony for the defense was readily discredited.

(Motion opinion p. 33-34) Regarding Blackwell's admissions on cross-examination, this Court noted that "[s]he had little choice. The government had in its possession tape recordings of the relevant telephone calls. . . . Although the government had proffered the calls in evidence, it withdrew that request after

Dina Blackwell admitted the essentials on cross-examination. (Tr. 496)" (Motion opinion p. 33, n. 20)

Defendant Tullies submits that per the requirements of *Strickland v. Washington* he has shown that he was deprived of his right to competent counsel. His attorney (1) failed to exercise the customary skill and diligence that a reasonably competent attorney would have employed under the same set of circumstances; and (2) the ineffectiveness prejudiced him. He respectfully requests that the Court grant his motion pursuant to 28 U.S.C. § 2255(a).

> **Ground 2: If The Calling Of Dina Blackwell As A Witness Did Not Render Counsel Ineffective, His Failure To Salvage Her Credibility By Calling The Investigator That He Claimed Was With Her Resulted In Ineffective Assistance Of Counsel.**

As the previous subsection argues, the calling of Dina Blackwell to the witness stand doomed the defense. Should this Court find that calling Dina Blackwell as a defense witness did not render counsel constitutionally ineffective, it is submitted that the defense attorney's failure to bolster her credibility by calling the much-discussed defense investigator that counsel claimed was with her when she saw the witness John Potts at municipal court, surely added to the problematic actions of counsel and resulted in ineffective assistance of counsel.

As this Court has noted, Dina Blackwell "testified in a manner that would have permitted the jury to infer that she had put tacit

pressure on Potts." (Motion opinion p. 33) The U.S. Attorneys forcefully made that argument through the examination of Blackwell and summation.

In an effort to counteract the government's suggestion that Blackwell spoke with Potts and pressured him in some way, defense counsel brought out on the redirect of Potts that defense counsel's investigator was there when Potts saw Blackwell at municipal court, and Potts agreed that the conversation that took place was between him, his attorney and the investigator.[6] But even after Blackwell's disastrous testimony, counsel for defendant Tullies never called his investigator to the stand to verify that: (1) he, the investigator, was in fact there in court; (2) he spoke with Potts and Potts's attorney about the upcoming matter at bar; and (3) of critical importance, Blackwell did not put any pressure on Potts.

In *Carpenter v. Vaughn*, 888 F. Supp. 635, 654 (M.D.Pa. 1994), the district court considered the *habeas corpus* petition of a state inmate in Pennsylvania. Among other things, the petitioner had contended "that trial counsel was ineffective for failing to call to testify at trial an eyewitness whose testimony would have corroborated petitioner's version of events." In that case, a woman named Emmil testified that she saw the petitioner stab the victim

---

[6] The redirect examination regarding the presence of defense counsel's investigator at Potts's municipal court appearance is quoted above in subsection A, and can be found at Tr. 478-79.

to death; the petitioner testified that he saw Emmil stab the victim to death. The court noted: "It cannot reasonably be disputed that the jury's verdict in petitioner's case was contingent upon witness credibility, in particular." *Id.* at 654-55. The court noted that Emmil did not have a police record, and therefore "[h]er testimony had a high degree of credibility." *Id.* at 655. On the other hand, petitioner had a record that included a prior murder. "Petitioner's testimony, therefore, had a considerably lower degree of credibility than that of Emmil. In order for the jury to believe petitioner's version of events, corroborating testimony was crucial. No such testimony was offered, although it apparently existed." *Id.* (emphasis added). The district court noted that "[i]f this witness had testified as proffered by petitioner, there is no question that the testimony would have strongly bolstered petitioner's version of events." 888 F.Supp. at 655.

Likewise, testimony by Murphy's investigator would have surely helped to bolster Blackwell's credibility and blunt the government's attempt to convince the jury that Potts's exculpatory testimony was false, and was motivated by pressure from Blackwell (and inferentially by her fiancé Jesse Tullies). It was inexcusable to put Blackwell on the witness stand and then, after withering cross-examination on the issue of alleged undue influence she put on Potts at the behest of Tullies, fail to call the investigator who was there at the municipal courthouse and who could have

testified that Blackwell was there but she did not participate in the conversation with the key defense witness.

Defendant Tullies submits that per the requirements of *Strickland v. Washington* he has shown that he was deprived of his right to competent counsel. His attorney (1) failed to exercise the customary skill and diligence that a reasonably competent attorney would have employed under the same set of circumstances when he failed to call his investigator as a witness; and (2) the ineffectiveness prejudiced him, as noted in this Court's synopsis in the motion opinion of how damaging Blackwell's testimony was to the defense. Jesse Tullies respectfully requests that the Court grant his motion pursuant to 28 U.S.C. § 2255(a).

> **Ground 3: The Testimony Of FBI Agent John Havens, Jr., Appearing As An Expert For The Government, Should Have Been Objected To And Deemed Inadmissible Because It Directly Commented On The Mens Rea Of The Defendants In Violation Of F.R.E. 704(b).**

As noted earlier, FBI Agent John Havens, Jr., testified as an expert in "methods used by drug dealers to conduct street-level drug business to include the distribution, packaging, pricing, and storage of the drugs, and also the use of firearms in furtherance thereof." (Tr. 382) This Court described his testimony as follows:

> Havens testified that street-level drug dealers will typically set up a territory, often on a quiet block, will protect that territory, and will generally permit only one brand to be sold within that territory. Transactions, he explained, are generally done

25

in cash, and often in small bills, which may
be traded in for larger bills at local
businesses such as bodegas. The packaging of
the drugs and the currency seized in this
case, he opined, were typical. (Tr. 374-398)
Havens testified that street-level dealers do
not want to be caught in physical possession
of drugs, so they typically stash them at a
location which they can monitor. They then
retrieve amounts as necessary for sales. To
maintain deniability, the location would
typically not be owned by or traceable to the
dealer. The facts of this case, he opined, fit
that pattern. (Tr. 398-401)

(Motion opinion p. 4)

Havens also testified that drug dealers use guns to protect
their product from robbery, to protect their territory from other
drug dealers and to make sure that they get paid by the buyers.
According to Havens, guns are sometimes kept with the stash of
drugs so that the dealer can avoid being caught in actual
possession of the guns.[7] Havens again testified that the typical
pattern of gun possession by drug dealers fit the facts of this
case. (Tr. 401-04)

It is submitted that counsel for defendant Tullies provided
constitutionally ineffective assistance to his client by failing
to object to the expert law-enforcement testimony outlined above.
By expressing his opinion that the facts of this very case fit the

---

[7]Neither defense attorney cross-examined Agent Havens about the
incongruity in his testimony regarding the need of drug dealers to
possess guns in order to protect their territory, yet keeping the
guns with the drug stash and therefore out of reach if needed.

26

pattern of drug dealing and illegal gun possession, the expert improperly referred to the defendants's intent to sell illegal drugs. The mental state, or *mens rea*, of Jesse Tullies was an element of the charged offenses and the determination of that element should have been left to the jury, unburdened by the very convincing but inappropriate testimony of the FBI expert.

According to *Fed. R. Evid.* 702, a witness may provide an expert opinion if he or she is "qualified as an expert by knowledge, skill, experience, training, or education." The United States Supreme Court has explained that "[w]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has a reliable basis in knowledge and experience of [the relevant] discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). Defendant concedes that the operations of drug dealers has been deemed a proper field of expertise. "[E]xperienced narcotics agents may testify about the significance of certain conduct or methods of operation to the drug distribution business, as such testimony is often helpful in assisting the trier of fact understand the evidence." *United States v. Griffith*, 118 F.3d 318, 321 (5th Cir. 1997). However, under *Fed. R. Evid.* 704(b) no expert witness "testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or

did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone."

The Third Circuit has noted that "[e]xpert testimony concerning the modus operandi of individuals involved in drug trafficking does not violate *Rule* 704(b). For example, a Government expert may testify about the meaning of narcotics code words…. A Government expert may also testify about the quantity, purity, usual dosage units, and street value of narcotics…. And, an expert may testify about the various counter-surveillance techniques used by drug dealers to avoid detection by the police." *State v. Watson*, 260 F.3d 301, 308 (3d. Cir. 2001) (citations omitted)

On the other hand, *Watson* made clear that "[t]here is, however, 'a [fine] line that expert witnesses may not cross.' *United States v. Mitchell*, 302 U.S. App 153, 996 F.2d 419, 422 (D.C. Cir. 1993)." *Watson*, 260 F.3d at 308. The court explained the scope of the Rule: "*Rule 704(b)* may be violated when the prosecutor's question is plainly designed to elicit the expert's testimony about the mental state of the defendant, or when the expert triggers the application of *Rule 704(b)* by directly referring to the defendant's intent, mental state, or mens rea." *Watson*, 260 F.3d at 309 (citations omitted). Further, the Third Circuit said that "*Rule 704* prohibits testimony from which it necessarily follows, if the testimony is credited, that the

28

defendant did or did not possess the requisite mens rea." *Id.* (quotation omitted); *accord United States v. Robinson,* 562 Fed. Appx. 72 (3d Cir. 2014); *United States v. Underwood,* 246 Fed. Appx. 92 (3d Cir. 2007)

Like the defendant in *Watson,* Jesse Tullies was plainly prejudiced by the expert testimony concerning his mens rea. The failure of the attorney for Tullies to interject an objection to that repeated, improper testimony stripped Tullies of his constitutional right to a fair trial with the assistance of effective counsel.

> **Ground 4: Defense Counsel's Erroneous View Of The Law And Trial Practice Resulted In His Ineffective Representation Of Defendant Tullies When He Failed To Use Defendant's Phone Records To Dispute The Claims Of The Law Enforcement Witnesses.**

In his affidavit in support of the instant motion, Jesse Tullies said: "Prior to trial I advised my attorney, James R. Murphy, Esq. that I was on my phone prior to arriving at the scene of my arrest. Prior to trial I provided my attorney with records of those calls from my carrier." (Defense Motion Appendix 2) In his sentencing memorandum (Defendant Motion Appendix 4-19), defense counsel Murphy acknowledged that he had received his client's relevant cell-phone bill, but he explained why he made no use of that information at trial:

> On March 23, 2018, I was emailed the
> attached portion of Jesse Tullies cell phone

29

> bill indicating incoming and outgoing calls on
> October 4, 2017. As the calls were made to and
> by Mr. Tullies, I put the document on hold as
> <u>I was of the opinion that he would need to</u>
> <u>testify as to the calls</u>. The document
> indicates he made an outgoing call at 1:34
> when he was supposedly in custody.

(Defense Motion Appendix 7)(emphasis added)

Defense counsel flatly stated that he did not use defendant's phone records to show the jury that Jesse Tullies was not where the government's witnesses said he was at the critical time of the events at bar because he "was of the opinion that [Tullies] would need to testify as to the calls." That clear error certainly satisfies the first prong of *Strickland.*

Further, the phone records reveal that Mr. Tullies was on the phone at the same time that law-enforcement claimed the drug transactions occurred. No where in Detective Ellis' testimony does he ever indicate that Tullies was on the phone at any time during his surveillance. This directly undermines the testimony of Ellis.

Trial counsel's assertion that he could only introduce the phone records into evidence through the testimony of Tullies is erroneous. The trial attorney could have easily obtained testimony from the law-enforcement witnesses that when Tullies was arrested he was in possession of the telephone in question and that that phone was logged into property. Additionally, the trial attorney could have utilized F.R.E. 803(6) to introduce the telephone-call records. The mechanism for this would have been quite simple -- a

custodian of records from the carrier could have been called to testify and certified records could have been explained to the jury; and once the proper foundation was laid they could have been admitted into evidence. That procedure is commonly used to get cell-phone records into evidence during trials.

Defense counsel Murphy was simply wrong in his assessment that his client would have to testify in order for the jury to receive evidence that he himself had concluded would indicate that Tullies made an outgoing phone call when he was supposedly in custody. That critical error resulted in a failure to exercise the customary skill and diligence that a reasonably competent attorney would have employed under the same set of circumstances. *Strickland v. Washington*, 466 U.S. at 687 (Prong One). Defense counsel's ineffectiveness surely prejudiced Jesse Tullies. His attorney forfeited the ability to show the jury that he was not guilty because he simply was not where the government's witnesses said he was during the critical time of the events at bar. *Strickland v. Washington*, 466 U.S. at 687 (Prong Two). Jesse Tullies respectfully requests that the Court grant his motion pursuant to 28 U.S.C. § 2255(a).

### Ground 5: Defense Counsel Failed To Request That Obvious Jencks Materials Be Provided To The Defense.

Government disclosure of exculpatory material and impeachment evidence is part of the constitutional guarantee to a fair trial.

31

*Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The law requires the disclosure of exculpatory and impeachment evidence when such evidence is material to guilt or punishment. *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154. Because *Brady* and *Giglio* are constitutional obligations, *Brady/Giglio* evidence must be disclosed regardless of whether the defendant makes a request for exculpatory or impeachment evidence. *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995).

With respect to pretrial statements made by witnesses that the government calls at trial, the Jencks Act (18 U.S.C. § 3500) requires the prosecutor to produce a verbatim statement or report made by a government witness or prospective government witness after the witness has testified. The term originated with *Jencks v. United States*, 353 U.S. 657 (1957), in which the United States Supreme Court held that the government must produce certain statements of its witnesses to the defense. The holding was later codified in the Jencks Act. In order for the Government to be compelled to disclose a witness's prior statements, the statements must relate to the subject matter of the direct testimony of the witness. Under the Jencks Act, the Government has a duty to preserve all statements that are required to be produced.

In the matter at bar, it is clear that the government provided the defense with various audio files which contained the dispatch

recordings of the transmissions and discussions of some of the officers who were at the scene or nearby. In his sentencing memorandum (Defendant Motion Appendix 4-19), defense counsel James Murphy, Esq., explained how he reviewed those audio files **after** trial:

> As a result of the March 19, 2019 filing of a letter to Judge McNulty by Eugene Williams I again reviewed the Governments May 24, 2018 discovery package[.] the package contained Tullies Exhibit 183 which was a list of Audio Files for October 4, 2017 detailing the Essex County Sheriff's radio traffic from 12:48:38 to 2:46:45 by officers involved in the arrest of Tullies and Williams. The recordings are subject to interpretation but it would appear that the time lines testified to at trial by the officers were erroneous.

(Defense Motion Appendix 7)

In his affidavit in support of this motion Jesse Tullies points out that Murphy did not provide that discovery to defendant until six months **after** trial, and, most critically, Tullies noted that "[h]ad I been provided these materials prior to trial, I would have been able to advise my attorney that Officer Yusef Ellis' radio communications, the only alleged eyewitness to the alleged drug transactions, were missing." (Defendant Motion Appendix 2) Having received the audio files relevant to the other officers, there was no reasonable excuse for defense counsel to purposely not apply under the Jencks Act for the oral communications of the most important officer at the scene, Yusef Ellis. However, it

appears from counsel's own filing with the Court that he had failed to actually review what he had received from the prosecution until well after trial.

The recordings that Tullies did receive six months after his trial are devoid of any incriminating evidence against him. Further, Tullies was denied the opportunity to assist his counsel in pointing out the areas where the testimony was in conflict with the recording as well as requesting the missing recordings.

The allegations contained in this Ground, especially when combined with the allegations contained in Ground 4, paint a clear picture of an attorney who was woefully unprepared to represent Jesse Tullies in this case. Trial counsel was unaware of the procedures which would have enabled him to present to the jury his client's cell-phone records, and he did not realize that important Jencks material was available if he had only asked for it. Defendant submits that the failure to obtain the audio file of Yusef Ellis pursuant to the Jencks Act resulted in an unfair trial due to the ineffective assistance of counsel.

### Ground 6: The Cumulative Effect Of Counsel's Failures Establishes Prejudice.

When counsel's performance is deficient in various instances, a defendant can establish prejudice from the cumulative effect of the errors. *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009) ("Pursuant to the cumulative error doctrine, '[t]he

cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error.' *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990), *cited with approval in United States v. Martinez*, 277 F.3d 517, 532 (4th Cir. 2002."); *United States v. Russell*, 34 Fed. Appx. 927, 928 (4th Cir. 2002). That is certainly the case here.

### III. **REQUEST FOR AN EVIDENTIARY HEARING.**

The Court may rule on the petition without a hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255. As argued above, there are multiple reasons for granting relief in this case. The Court may also deny a petition without a hearing where the petition is devoid of factual allegations and contains solely legal conclusions. *Sanders v. United States*, 373 U.S. 1, 19 (1963). But in this case, at the very least testimony from defense counsel and perhaps a representative from Jesse Tullies's cell-phone carrier is required. Petitioner respectfully requests the opportunity to call witnesses at a hearing.

## CONCLUSION

For the reasons addressed above, it is respectfully that Jesse

Tullies's conviction and sentence be vacated.

John J. McMahon
Attorney At Law
80 Main Street, Suite 580
West Orange, NJ 07052
PHONE (973)761-2210:
FAX (973)761-2075
EMAIL: jmc@jjmcmahonlaw.com
Attorney for Petitioner

Dated: May 2, 2023

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA                          Cr. No. 18-21(KM)

vs.

JESSE TULLIES                                     Hon. Kevin McNulty, U.S.D.J.

### AFFIDAVIT OF DINA TARRIER BLACKWELL

I, Dina Tarrier Blackwell, do hereby swear and affirm the following:

1. I currently reside at 834 Westminster Ave in Hillside, New Jersey 07205.
2. I am married to Jesse Tullies in the Islamic faith but that union was not formalized by legal marriage in the State of New Jersey. For that reason, I identify myself as Jesse Tullies' fiancé.
3. I was called as a defense witness at Jesse Tullies' trial. At that trial Mr. Tullies was represented by James R. Murphy, Esq.
4. Prior to being called as a witness, I was never prepared by Mr. Murphy. I was never asked to meet him at his office nor did he ever come to my home or seek to meet me at any location.
5. I only spoke with Mr. Murphy briefly at the courthouse prior to being called as a witness.
6. Specifically, Mr. Murphy never advised me as to what cross-examination would occur nor that I would be questioned about prior conversations with Mr. Tullies.
7. In summary, Mr. Murphy called me as a defense witness without any preparation whatsoever.

Dina Tarrier Blackwell

Sworn and subscribed to me
this 24 day of Apr. 2023

John J. McMahon, Esq.
Attorney at Law-State of New Jersey
Admitted Dec. 1989

1a

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA                                Cr. No. 18-21(KM)

vs.

JESSE TULLIES                                Hon. Kevin McNulty, U.S.D.J.

**AFFIDAVIT OF JESSE TULLIES**

I, Jesse Tullies, do hereby swear and affirm the following:

1. I am currently incarcerated in the Federal Bureau of Prison Correctional Institution Hazelton located at 1640 Sky View Drive, Bruceton Mills, West Virginia 26525. My BOP # is 71286-050.
2. I was tried before the Honorable Kevin McNulty, U.S.D.J. in the above matter and was convicted by a jury.
3. Prior to trial I advised my attorney, James R. Murphy, Esq. that I was on my phone prior to arriving at the scene of my arrest.
4. Prior to trial I provided my attorney with records of those calls from my carrier.
5. Neither prior to my trial nor during my trial was I ever provided with the audio files containing the Essex County Sheriff's radio traffic by officers involved in my case. These audio files are referenced in Mr. Murphy's March 29, 2019 sentencing memorandum as trial exhibit 183 with an indication that they were provided to Mr. Murphy on May 24, 2018, as part of a government discovery package.
6. As I advised the Court in my March 28, 2019 sentencing memorandum, I was never provided these materials until December of 2018 – some six months after the conclusion of my trial.
7. Had I been provided these materials prior to trial, I would have been able to advise my attorney that Officer Yusef Ellis' radio communications, the only alleged eyewitness to the alleged drug transactions, were missing.
8. I also would have been able to advise Mr. Murphy that my phone records contradicted the timeline of events reported by the sheriff audio files. A fact that Mr. Murphy was completely unaware of at trial and only realized in March of 2019.

2a

9. The phone I made the calls from was on my person at the time of my arrest, was taken from me by law enforcement and was entered into property.

_J Tullies_
Jesse Tullies

Sworn and subscribed to me
this 25 day of April 2023

John J. McMahon, Esq.
Attorney at Law-State of New Jersey
Admitted Dec. 1989

3a

# Law Office Of
# JAMES R. MURPHY

**947 STATE ROAD**
**SUITE 205**
**PRINCETON, N.J. 08540**

**TELEPHONE**
**(609) 497-1994**
**FACSIMILE**
**(609) 497-1967**

### JAMES R. MURPHY

Certified by the Supreme Court
of New Jersey as a Criminal Trial Attorney
**jrmm26@att.net**

### FLORENCE V. HUGHES

**Of Counsel**
**Member N.J. & Fl. Bars**
**fvhughes@att.net**

Via Email

March 29, 2019

Hon. Kevin McNulty, U.S.D.J.
Lautenberg U.S.P.O. & Courthouse
Room. 443
Federal Square
Newark, NJ 07102

RE: USA v Jesse Tullies
18 Cr. 21
Sentence Memorandum / Motion for a Downward Departure /Request for Variance Relief -
Sentence Date 4/10/2019 @ 10am

Dear Judge McNulty:

　　　　Please accept this letter sentence memorandum Motion for a Downward Departure and
Variance Request in lieu of a more formal sentencing memorandum and motion, wherein Jesse
Tullies  requests that Your Honor consider his position as to an appropriate sentence.

### Booker Considerations

　　　　As a Post-Booker sentence, the factors to be considered in imposing a sentence are recited
in 18 U.S.C. Section 3553(a). Under Section 3553 (a) , Your Honor is to fashion a sentence
which is "sufficient , but not greater than necessary" to achieve the purposes of sentencing set
forth in Section 3553(a)(2):

　　The court, in determining the particular sentence to be imposed, shall consider:
(1) the nature and circumstances of the offense and the history and characteristics of the
defendant;
(2) the need for the sentence imposed
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just
punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or
other correctional treatment in the most effective manner;" 18 U.S.C. Section 3553(a)

4 a

To arrive at a sentence that serves those goals without being greater than necessary, the Act directs the judge to consider the many factors listed in §3553(a)(1) - (7). These considerations are more than a laundry list of discrete sentencing factors. They comprise "a tapestry of factors, through which runs an overarching principle," the court's duty "construct a sentence that is minimally sufficient to achieve the broad goals of sentencing." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir.-2008).

Section 3553(a)(1) begins with the "broad command" to consider the nature and circumstances of the offense and the history and characteristics of the defendant. The statute also requires judges to consider the types of sentences available by statute, section 3553(a)(3), including "sentences other than imprisonment," such as probation. *See Gall*, *id.*, and at 595-596 and n.4, 602 (probationary sentence reflected consideration of types of sentence available, and discussing probation as substantial restriction on freedom based on conditions of supervision). Although sections 3553(a)(4) & (5) require the district court to consider the advisory Sentencing Guidelines range and relevant policy statements by the Sentencing Commission, the Guidelines can provide only a "rough approximation" of what might be an appropriate sentence. *Rita v. United States*, 127 S.Ct. 2456, 2465 (2007). Section 3553(a)(6) requires the district court to consider the need to avoid unwarranted disparities in choosing a sentence, yet this encompasses a corresponding duty to avoid "unwarranted similarities" among defendants who are not similarly situated. *See Gall*, at 600 (sentence of probation reflected defendant's voluntary withdrawal from conspiracy, whereas conspirators who did not withdraw received prison terms). Finally, section 3553(a)(7) requires that the court consider the need for restitution, if applicable.

The Supreme Court envisions that a district court will normally begin its analysis by accurately calculating the Guideline range, but then may consider arguments that the Guideline sentence should not apply because the guideline itself fails properly to reflect Section 3553(a) considerations, reflects an unsound judgment, does not treat defendant characteristics in the proper way, or that a different sentence is appropriate regardless.

The Court places nothing off-limits for district courts. All the Guidelines are advisory and a judge may determine that any within Guidelines sentence is "greater than necessary" to serve the objectives of sentencing. *Kimbrough* , at 564. District courts may not simply defer to policies of the Commission. *Rita*, at 2468. Judges may disagree with the guideline range based solely on policy grounds even in a mine-run case, without justifying this disagreement based on an individualized determination that they yield an excessive sentence in a particular case. *Spears v. United States*, 129 S. Ct. 840, 843 (2009); *Kimbrough*, at 567-69. *Rita, Kimbrough* and *Spears* supply this power even when the Guideline's provision is a direct reflection of a congressional directive, *Rodriguez*, 522 F.3d at 230, or where that disagreement applies in other "mine-run" situations, or to a wide class of offenders or offenses. *Kimbrough,* at 574-75, *Spears*, at 843.

The district court must make an "individualized assessment" based on all the circumstances of the case and under all of the §3553(a) factors, and must not presume that the advisory guideline range is "reasonable," *Gall*, at597, or that the guideline sentence is the correct one. *Nelson v. U.S.,* 129 S.Ct. 890, 892 (2009),*Gall*, at 596-97, *Rita*, at 2465. Judges cannot require an extraordinary reason to deviate from the guideline range based on § 3553(a) factors. *Gall,* at 595; *Nelson,* at 892.,

2
Sa

## The Offense

Jesse Tullies has and continues to maintain his innocense . Stephanie Davis testified for the defense that she had arrived on Weequahic Ave on October 4, 2017 at about 1 pm with her best friend Leanna Travers the daughter of Jesse Tullies. They parked and were looking for Mr. Tullies when she saw him arrive on Weequahic in a blue car owned by Audrey Blackwell .Tullies parked and exited the vehicle and after talking to a female cousin was coming over to Stephanie's car when four police vehicles pulled up blocking all cars and took Tullies into custody. They advised everyone not to move , took Stephanie's keys and after 20 or 30 minutes were advised by the officers that they free to leave. Leanna Travers testified that she is the daughter of Jesse Tullies and on October 4, 2017at about 1pm she was on Weequahic with Stephanie Davis looking for her father to get some money from him. Tuliies drove up and parked a car and walked to another vehicle . Police vehicles pulled up and the officers told the occupants of the vehicle to stay put , took the keysand placed Mr. Tullies in custody. John Potts testified for the defense that he purchased heroin on October 4, 2017 on Weequahic Avenue but not from either Tullies or Williams. He was absolutely certain that Tullies had not sold him any drugs. He only knew Tullies and Williams because they originally had been placed in the same police vehicle after their arrest.

During the course of the trial the Government sought unsuccessfully to introduce evidence of Tullies prior drug convictions for selling drugs on  prior occasions on Weequahic Ave. The Government further unsuccessfully sought to introduce a jail call on October 18, 2017 between Tullies and his mother wherein Tullies responded to his mother's query wherein she asked if he was on someone else's territory:

**Tullies**: *Nah what are you talking about Ma that was my territory Ma. Territory ... eh I'm in the same spot I always been all my life and that territory's my territory. [scoff] I ain't doing nothing. Know what I'm saying? Anything I go get my daughter some money and those niggas box us in. That's exactly what happened. I could say this, I could say this, you know what I'm saying, understand with my eyes closed. 100 times the way it went down.*

This was after the Government had presented an expert witness to discuss drug dealers' concept of territory. However that was not the whole call. The government did not want the jury to hear the earlier portion of the conversation:

*Tullies:  They ain't talking about. They said in the paper said they see me talk to this dude. My man supposed to gave me some drugs. I went and sold the drugs and I put the drugs in [inaudible] this crazy stuff they say in the paper and all this way it's supposed to be ain't none of this never even happened. You know what I'm saying. So the dude went to court. They did lock somebody up but it had nothing to do with us though. He had two bags of dope and um it had nothing to do with us though. I'm saying he ain't never pointed us out never said we did none of this stuff. Police making all this up though. You know what I'm saying. They fabricated this whole story man that's the crazy part. Like for real. You know that's just the crazy part right there. They fabricating the whole story. Like none of this never even happened.*

3          6a

*Mom:   And what's the purpose of them doing that?*
*Tullies:   Man I do not know, mom.  That's the part I just can't put my*
*hands around [inaudible] there's no way in the world I've been home 62*
*days, so there is nothing I could have did to them niggas.  Like literally like*
*for real.  Like I just can't put my hands around it.  I've been home for 62*
*days what I could have possibly done to niggas in 62 days.  Nothing.  For*
*them police to do what they did.  That's the God's honest truth.  I can't*
*figure it out I cannot put my hands around it.  I'm trying to grasp it grasp it*
*and I just can't.  I've been home for 62 days what can I have possibly did to*
*y'all niggas in 62 days.  Nothing.  To make y'all niggas be mad at me.*
*That much.  Then they gonna set me up.  For real*

On March 23, 2018, I was emailed the attached portion of Jesse Tullies cell phone bill
indicating incoming and outgoing calls on October 4, 2017. As the calls were made to and by
Mr. Tullies , I put the document on hold as I was of the opinion that he would need to testify as
to the calls. The document indicates he made an outgoing call at 1:34 when he was supposedly in
custody.

As a result of the March 19, 2019 filing  of a letter to Judge McNulty by Eugene Williams
I again reviewed the Governments May 24, 2018 discovery package  The package contained
Tullies Exhibit 183 which was a list of Audio Files for October 4, 2017 detailing the Essex
County Sheriffs radio traffic from 12:48:38 to 2:46:45 by officers involved in the arrest of Tullies
and Williams. The recordings are subject to interpretation but it would appear that the time lines
testified to at trial by the officers were erroneous.  I cite the following examples:

Audio10288 "Hey, we grabbin this guy?" Male Voice .1:01:22

Audio 10290 " Hey, go with that description"Male voice. 1:02:04

 Audio 10293 "We got him, we got him. Stand by" Male Voice . Female Voice "What's your
location" 1:03:11

Audio 10294 " (unclear word) negative stuff" Female Voice 1:19: 40

Audio 10295 " Negative we cant find it , we lookin " Female voice 1:21; 27

Audio 10310 " Hey Docke, you going to get the car or do you want us to get it? Yea we
moved , you gonna get or do you want us to get it.?" Female voice 1:36:22

Audio 10309  " You want us to pick another buyer off or? "Female Voice. 1:42:36

Audio 10311 "Yeah so give me a description , how many targets?" Female voice 1:43:33

Audio 10312 " Standby. Give us a minute, we gotta park this car." Male Voice 1:45:33

Audio 10313 " Sheriff go, we all in go" Male Voice 1:46:09

Audio 10318 Advising central that at 391 Weequahic "... we have three under arrest"
1:52:43

The three under arrest are later identified as Williams , Potts and Tullies at 2:23:57
They were at the CourtHouse at 2:45:07 ( Audio 10337)

Audio 10311, 10312 and  10313 would seem to indicate that the Sheriffs officers
converged on 391 Weequahic at 1:46 :09 and not earlier as testified at trial and possibly Potts'
was arrested at 1:03:11 ( Audio 10293)

4.

7a

Thus if the officer's testifying could not even keep the times right , it is a fair question to ask -what else were they wrong about.

I suggest as Mr. Tullies told his mother he was set up by the police. Wrong place and wrong time.

### Jessie Tullies

Jessie Tullies was a small time drug dealer in Newark for most of his adult life . He is facing the same life sentence as "El Chapo: " for what amounts to a "dime bag". In the past he has always plead guilty and never gone to trial. To say he has been on the radar of Newark law enforcement would be an understatement. The desk officer at the Essex County Jail mentioned to me that Jesse " was a regular " at the facility.

Jesse has fathered 13 children including 4 minor children. Probation identified no outstanding child support orders. Jesse had current employment with LLS Trucking from 2006 to 2017 as a helper and some time driver. Employment was sporadic due to his incarcerations. He also at the same time had employment at King's Restaurant as a clean up man and Janitor.

To sentence Mr. Tullies , who is 54 years old to the Governments recommendation of the Guideline range of 360 months is in effect a death sentence. I have represented individuals charged with murder in State Court who in pleas and in pleas after appellate reversal of a trial verdict have received sentences for manslaughter and aggravated manslaughter of 5 to 10 years. The only clients in my 40 year practice to receive a life sentence after trial was an individual charged in Federal court with the murder of a Government informant . The Government had sought the death penalty but the Attorney General declined to allow the Government to file after our presentation at Main Justice to the Death Penalty Committee. A second individual was sentenced to life after trial because the Government filed two 851 enhancements. That individual an alleged Bloods "shot caller "and gang leader is now eligible for a sentence reduction under the First Step Act.

### Criminal Record

Probation determined Tullies to be a Career Offender based on three convictions dented in paragraphs 88, 92, and 93. While Tullies was sentenced on three different dates for the offenses ( 10/6/2014, 10/17/2014 and 2/5/16 )he was given concurrent sentences as to each of the three offenses. Thus his sentences were 4 years , 18 months mpi concurrent to a sentence of 5 years and concurrent to a sentence of 3 years mpi 18 months . There was an additional non career offender status sentence on 10/6/2014 detailed in paragraph 90 that resulted in a concurrent sentence of 4 years with mpi of 18 months. Thus Tullies was able to wrap up 4 charges and garner a release date of 8/2/2017. All of the career offender offenses under New Jersey Law would have to have been 3d degree offenses that carry a maximum of 5 years incarceration and quantity of CDS involved would have to have been less than one ounce . NJS 2C: 35-5; 2C:35-7

5

$8_\alpha$

Probation scored Mr. Tullies an offense level 32 with a criminal history category of VI because of a calculated 27 criminal history points. It should be noted that 9 of those points deal with arrests in March , May and July of 1999 . Additionally 4 of the points were for Municipal Court matters.

## Present Offense

The instant matter was  initially a State Court matter . The investigating and arresting officers were Essex County Sheriff's Officers..There was no federal involvement with the actions by law enforcement on October 4, 2017. ATF became involved because of the gun charges.

At the Complaint stage in State Court  Tullies was charged with 17 offenses of which 8 were drug offenses and all were 3rd degree with a maximum sentence of 5 years; one was a receiving stolen property 3rd degree with a maximum sentence of 5 years; 6 were weapons offenses and all were  offenses of the 2nd degree with a maximum sentence of 10 years; one was for possession of hollow point bullets a crime of the 4th degree with a maximum sentence of 18 months and the last was a drug conspiracy charge of the second degree with a maximum sentence of 10 years.

Had Mr. Tullies been indicted and gone to trial in State Court his probable maximum sentence would have been 10 years with a minimum parole ineligibility of five years assuming concurrent sentences, which is the norm.

The statutory scheme Mr. Tullies presently faces is more draconian.:

Count 1- Max 20 years
Count 2-Max 20 years
Count 3- Max 20 years
Count 4-Max 10 years
Count 6- 5 years to Life -But consecutive to any other Counts

Under the Guidelines an offense level 32 with a criminal History VI has a Guideline range of 210 to 262 months. As Count 6 requires a 60 month consecutive term the guideline range is increased to 270 to 322 months . However as Mr. Tullies is considered a career offender with a 924c conviction is guideline range is 360 months to life.

## Letters of Support

I  have been advised by Dina Blackwell that letters of support for Mr. Tullies have been sent to the Court. I have not been copied on same but request that Your Honor take those in consideration in your sentence of Mr. . Tullies.

6.

$9_a$

## Motion for Downward  Departure
### Pursuant to 4A1.3

I had advised Mr. Tullies that I wold make any appropriate Motion for Downward Departures .  A review of the Sentence Guidelines indicates that a Downward Departure based on his Criminal History is appropriate -"[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history

However as Mr. Tullies is considered a Career Offender as a result of that Criminal History , the only relief for a Career Offender under the Guidelines  within the meaning of §4B1.1 (Career Offender), is  a downward departure to one criminal history category.

Thus while I make this motion, I believe  that a Variance is more appropriat.

### Variance Request
**Criminal history/career offender guidelines improperly inflate sentence**

U.S.S.G.  4A1.3 ("If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.") .

*U.S. v. Boardman,* 528 F.3d 86, 87-88 (1st Cir. 2008)(holding that *Kimbrough* granted district courts "broader freedom" to determine whether prior convictions qualify as predicate crimes of violence for purposes of the career offender Guideline); *U.S. v. Sanchez,* 517 F.3d 651, 662-67 (2nd Cir. 2008)(remanded for clarification as to whether sentence was affected by judge's mistaken view that 28 U.S.C. Sec. 994(h) restricted his authority to impose a non-Guideline sentence or to grant further downward departure; district court granted 2-level downward departure because career offender offense level failed to account for defendant's lesser role in the drug conspiracy, remarked that guideline sentence of 188 months was longer than necessary and defendant could be deterred by even mandatory minimum 120 months, but that it lacked authority to impose lower sentence; holding that 994(h)'s instruction to the Sentencing Commission that it assure sentences for career offenders "at or near" statutory maximum did not deprive district court of authority to impose shorter sentences by way of a non-Guideline sentence or departure; no statutory provision requires career offenders to be sentenced at or near the statutory maximum and district court must only consider Congress's views in context of  3553(a) considerations); *U.S. v. Ennis,* 468 F.Supp.2d 228, 234 & n.11 (D.Mass.2006)(observing that career offender predicates include misdemeanor convictions contrary to 28 U.S.C. Sec. 994(h), from states with misdemeanors punishable by more than one year); *U.S. v. Hodges,* 2009 WL 366231 (E.D. N.Y., Feb. 12, 2009) (rejecting career offender range for 43-year-old whose prior convictions were remote, non-violent, and reflected his drug addiction, and the most serious offense occurred in his early twenties, leading to a 10 year sentence that he completed); *U.S. v. Moreland,* 568 F. Supp. 2d 674 (S.D. W. Va. 2008) (career

7

offender
guideline range of 30 years to life rejected in favor of 120 months for a man convicted
of sale and possession of small amount of cocaine base, with a non-violent record so meager that
the total quantity involved in his entire criminal history "would rattle around in a matchbox",
and whose predicate offenses had no temporal proximity to each other or the instant offense);
*U.S. v. Patzer*, 548 F.Supp.2d 612 (N.D.Ill.,2008) (13 year prison term imposed for bank robbery
and gun offense despite a career offender range of 346-411 months, because Patzer's priors were
less serious than most predicate crimes, and in light of his difficult childhood and the improper
diagnosis of and treatment for his ADD from which his offense conduct stemmed).

## Criminal history category over-represents the seriousness of past criminal conduct or exaggerates a defendant's propensity to commit crime

*U.S. v. Herrick, 545 F.3d 53* (1st Cir.2008) (court granted departure from criminal
history category IV to category III , concluding the defendant's CHC overstated the likelihood
he would reoffend, particularly where his last conviction was 12 years earlier); *U.S. v. Jenkins*,
537 F.3d 1 (1st Cir 2008) (Although district court denied departure for overstated criminal
history, it varied 62 months below the minimum 262 guideline sentence after balancing
defendant's history as a gross recidivist against his history as a low-level, non-violent drug
offender); *U.S. v. Sanchez*, 517 F.3d 651, 655-58 (2nd Cir. 2008)(departures granted from career
offender category VI to V for overstated criminal history where record as to one defendant
consisted of two prior felony drug convictions, committed when defendant was very young and
he had never served more than 18 months in jail and guideline range was 262-327 and as to other
defendant, offenses were committed when defendant was in his teens and sentences were short;
see above discussion of *Sanchez* regarding remand for clarification of whether district court felt
constrained by 28 U.S.C.. Sec. 994(h) and for determination of whether court would have
sentenced defendant to same prison term in absence of perceived limitation); *U.S. v. Mishoe*,
241 F.3d 214 (2d Cir. 2001) (horizontal departure in criminal history category may be warranted
where prior sentences were lenient); *U.S. v. Villarini*, 298 Fed. Appx. 79 (2nd Cir. 2008) (unpub)
(court applied departure to use guideline range of 168-210 months because career offender range
of 188-235 months overstated criminal history); *U.S. v. Jones*, 216 F. App'x 189 (3d Cir. 2007)
(departure granted for overstated criminal history prior to *Booker*); *U.S. v. Yerena-Magana*, 478
F.3d 683 (5th Cir. 2007) (The Fifth Circuit affirmed a downward departure from category II to
category I for possession with intent to distribute marijuana. The defendant's prior crimes were
illegal reentry and possession with intent to distribute and they occurred at almost the same time.
The PSR assessed one point for these priors. The district court disagreed, assessed two points,
but then granted downward departure.); *U.S. v. Collington*, 461 F.3d 805 (6th Cir. 2006) (120-
month sentence in drugs-and-gun case upheld in the face of 188 -235 months advisory range, in
part because the judge found that defendant had never been in custody for a substantial period,
despite criminal history category of IV); *U.S. v. Gregor*, 339 F.3d 666 (8th Cir. 2003) (district
court may depart downward on the basis that career offender designation overrepresented
criminal history where burglary did not involve breaking and entering); *U.S. v. Lamb*, 214 F.
App'x 908 (11th Cir. 2007) (affirming 181 months for drug and firearm offenses despite
Guideline minimum of 420 months, in light of defendant's youth when he committed the crimes
that made him a career offender and his employment at Humane Society); *U.S. v. Thomas*, 361
F.3d 653 (D.C. Cir. 2004) (because arrests prove nothing, court erred in considering long arrest

11a

record to justify denial of downward departure for over-represented criminal history) *vacated and remanded in light of Booker*, 543 U.S. 1111 (2005).

*U.S. v. Evans*, 2009 U.S. Dist. LEXIS2700 (D. Conn., Jan. 13, 2009) (defendant convicted of crack crimes sentenced to 120 months rather than career offender range of 168-210 months which increased his criminal history category from category III to category VI, and in light of extraordinary rehabilitation); *U.S. v. Garrison*, 560 F.Supp.2d 83 (D. Mass. 2008) (judge compares sentences and backgrounds of other defendants caught up in same federal-local drug enforcement sweep and imposes non-guideline term, noting that criminal history categories promote false uniformity as they do not distinguish defendants whose convictions are nonviolent from those with violent priors); *U.S. v. McCormick*, 2008 WL 268441 (D. Neb. Jan. 28, 2008) (District court granted a departure based on overstated criminal history because the defendant had no crimes of violence as compared to usual category V defendants. The Court also varied because the defendant had already been released and became a productive member of society, he completed drug rehabilitation program, and he was a low risk of recidivism.); *U.S. v. Benkahla*, 501 F.Supp.2d 748 (E.D. Va. 2007) (Court departed downward under 4A1.3 for overstated criminal history. Under the Guidelines, a terrorism enhancement applied which automatically raised the criminal history to category VI regardless of the actual criminal history. The court concluded that it was not prevented from departing especially since Benkahla had no criminal history. The court set the criminal history category at I and sentenced him to the bottom of the Guidelines range.); *Marion v. U.S.*, 2008 WL 4602304 (D. Maine Oct. 15, 2008) (district court departed one criminal history category from the career offender level, noting that one of the predicate crimes was punished by only a fine and the other predicate offense brought the defendant a suspended sentence and then, upon his violation of probation, only 30 days; the district court observed that the sentencing judge's opinion in imposing sentence for the priors was more reliable proof of the nature of the crimes than the untested allegations in the underlying police reports); *U.S. v. Cuevas-Mendoza*, 2008 WL 4120060 (D. Kan. Aug. 26, 2008) (variance granted based on overstated criminal history, producing 18 month prison term for illegal reentry); *U.S. v. Mapp*, 2007 WL 485513 (E.D. Mich. Feb. 9, 2007) (departure granted from advisory range of 84-105 months to 37-46 months where defendant's criminal history was overstated in that his last conviction occurred in 1994 and all his criminal history points accrued during a two-year perod in his late teens for crimes involving small amounts of drugs, court then varied to 30 months based on defendant's oppressed upbringing by abusive parents which led to his grandmother taking him from age five); *U.S. v. Dickmann*, 2007 WL 442397 (E.D. Wis. Feb. 6, 2007) (departure granted from advisory range of 100-125 to advisory range of 87-108 range for conspiracy to distribute cocaine, because defendant's "scored" offenses had been nonviolent petty offenses attempting to get drug money, all occurring during a year in which defendant's life was falling apart; court then varied to 78 months because defendant did not play a major role in the offense, which was not violent, and it appeared he hung around drug dealers to feed his own addiction); *U.S. v. Person*, 377 F. Supp. 2d 308 (D. Mass 2005) (career offender status based on one drug sale "grossly overstated" seriousness of criminal record; departure granted from 262 to 84 months); *U.S. v. Wilkerson*, 183 F. Supp. 2d 373 (D. Mass. 2002) (criminal history category VI over-represented seriousness of defendant's criminal history warranting departure to IV, where he had no convictions for crimes of violence, and had received sentences for prior convictions which just barely triggered scoring under guidelines); *U.S. v. Naylor*, 359 F. Supp. 2d 521 (W.D. Va. 2005) (citing *Roper v. Simmons*, district court

9

$12a$

reduced career offender sentence from 188 to 120 months, discounting prior robbery convictions committed during a six week period as a juvenile, also reasoning that priors barely qualified and finding ten year sentence "a reasonable sentence ... within the sentencing range had he not been determined to be a career offender."); *U.S. v. Huerta-Rodriguez*, 355 F. Supp. 2d 1019 (D. Neb. 2005) (post-*Booker*, court imposed 36 months rather than 70-87 months, in part because court would have departed for over-stated criminal history in that prior occurred nearly 10 years before); *U.S. v. Hammond*, 240 F. Supp.2d 872 (E.D. Wis. 2003) (in departing from category III to II based on overstated criminal history, court may consider (1) the age of the priors, (2) the defendant's age at time of the priors, (3) whether drug and alcohol use were involved in the priors, (4) the circumstances of the priors ; (5) the length of the prior sentences; (6) the circumstances of the defendant's life at the time of the priors, and (7) the proximity of the priors. Here, the priors were relatively minor and remote in time – occurring 18-to-20 years earlier – and defendant was young and intoxicated when they occurred); *U.S. v. Qualls,* 373 F. Supp.2d 873 (E.D.Wis. 2005); *U.S. v. Moore*, 209 F. Supp. 2d 180 (D.D.C. 2002) (departure from range of 188 to 235 to range of 100-125 where career offender status over- represented defendant's criminal history, priors were attempts and involved small quantity of drugs, four years in between commission of previous offenses and instant offense, and relative length and nature of his previous sentences in comparison with sentence prescribed by the guidelines); *U.S. v. DeJesus*, 75 F. Supp. 2d 141 (S.D.N.Y. 1999) (category V over-represented defendant's criminal history where several priors resulted in probation, only one of three jail sentences exceeded 60 days, two of eight convictions involved loitering and trespass and did not count, remaining six convictions resulted in no more than 2 years jail, and most conduct occurred before age 21, whereas defendant was now married and responsible father and longer sentence under higher criminal history category "will lessen not increase the likelihood of rehabilitation.")

### The Sentencing Commission has recognized that the career offender designation can overstate the risk of recidivism

*See U.S. Sentencing Commission, Fifteen Years of Guideline Sentencing 133-34 (Nov. 2004)*("Incapacitating a low-level drug seller prevents little, if any, drug selling; the crime is simply committed by someone else."*); U.S. v. Ortiz*, 502 F.Supp.2d 712 (N.D. Ohio 2007) (District court imposed non-Guideline sentence because of unwarranted disparities with codefendant sentences. The court expressed problems with career offender guideline which fails to distinguish between offenders moving large quantities of drugs and a $20 sale of heroin like the defendant. The court split the difference between the mandatory minimum and the advisory range.); *U.S. v. Fernandez*, 436 F. Supp. 2d 983 (E.D. Wis. 2006) (court imposed 126 months because career offender guideline range of 188-235 months was greater than necessary to satisfy sentencing purposes, in part due to Sentencing Commission study on unfairness of career offender designation); *U.S. v. Franklin*, 2005 WL 1330959 (D.Kan. May 25, 2005) (unpub.) (noting the Commissions' finding that career offender provision overstates the likelihood of recidivism for drug trafficking offenders and particularly African-Americans, but rejecting departure here due to defendant's extensive criminal history).

13a

### Career offender designation conflicts with purposes of sentencing

*U.S. v. Mishoe*, 241 F.3d 214 (2d Cir. 2001) (a large disparity between the length of the prior sentences imposed and the guidelines sentence may indicate that a career offender term provides a deterrent effect in excess of what is required and may "constitute a mitigating circumstance present 'to a degree' not adequately considered by the Commission."); *U.S. v. Colon*, 2007 WL 4246470 (D. Vt. Nov. 29, 2007) (The difference between the prior sentences served justified a Guideline departure from career offender range. The court noted that the sentence would be over a ten-fold increase. In light of the nature of the prior offenses, the sentences served, and the large disparity between prior sentences and the present sentence, the Court found a downward departure was appropriate.); *U.S. v. Fernandez*, 436 F. Supp. 2d 983 (E.D. Wis. 2006) (career offender range of 188-235 months for defendant convicted of two prior sales when he was age 20 was greater than necessary to satisfy sentencing purposes. Absent career offender finding, guidelines called for 87-108 months; court imposed 126 months in part because Commission's study showed that in cases of low-level street dealers, career offender status often produces sentences far longer than prior sentences and greater than necessary to deter a defendant from re-offending); *U.S. v. Phelps*, 366 F. Supp. 2d 580 (E.D.Tenn. 2005) (it is not unusual for the definitions of "crime of violence" and "controlled substance offense" to operate to subject some defendants to extraordinary increases in the advisory Guideline range, which in some cases will be greater than necessary, especially where a defendant's prior convictions are old and he has demonstrated some ability to live for substantial periods crime free or in cases where a defendant barely qualifies as a career offender).

### Conclusion

While Mr. Tullies maintains his innocense , I respectfully request Your Honor consider a Variance sentence in light of Booker and 3553a considerations and more in line with what he might have received had the matter remained in State Court.

Respectfully submitted,

James R. Murphy
Attorney for Jesse Tullies

N.B. Case Law Courtesy of *Defending a Federal CriminalCase* by the Federal Defenders of San Diego, Inc., edited by Amy Baron-Evans, Sentencing Resource Counsel, Federal Defender Office, Boston, MA.

cc: Elaine K. Lou AUSA; Richard. J..Lee .U.S. Probation; Nitza Creegan; Pat Giannetta Client

*Continued...* **(908) 327-7090**

## Talk

The date and time corresponds to the local time where the mobile was located.

| Date and time | Number | Description |
|---|---|---|
| 10/04/17, 12:35 PM | (973) 755-7798 | Incoming |
| 10/04/17, 12:51 PM | (848) 236-6029 | Incoming |
| 10/04/17, 12:54 PM | (862) 452-7089 | to NEWARK/NJ |
| 10/04/17, 1:05 PM | (973) 510-9322 | to PASSAIC/NJ |
| 10/04/17, 1:06 PM | (973) 392-9614 | Incoming |
| 10/04/17, 1:07 PM | (848) 236-6029 | Incoming |
| 10/04/17, 1:08 PM | (973) 755-7799 | Incoming |
| 10/04/17, 1:15 PM | (862) 452-7089 | Incoming |
| 10/04/17, 1:25 PM | (973) 392-9614 | Incoming |
| 10/04/17, 1:30 PM | (973) 651-7969 | to ORANGE/NJ |
| 10/04/17, 1:30 PM | (201) 737-3004 | Incoming |
| 10/04/17, 1:31 PM | (973) 651-7969 | to ORANGE/NJ |
| 10/04/17, 1:34 PM | (973) 392-9614 | to NEWARK/NJ |
| 10/04/17, 1:41 PM | (973) 901-7794 | Incoming |

## Text

The date and time corresponds to Pacific Time (PST/PDT).

| Date and time | Number | Destination | Dir |
|---|---|---|---|
| 09/19/17, 5:02 AM | (862) 295-8068 | Passaic, NJ | Inco |
| 09/19/17, 5:46 AM | (908) 772-4068 | Elizabeth, NJ | Inco |
| 09/19/17, 5:47 AM | (908) 772-4068 | Elizabeth, NJ | Outg |
| 09/19/17, 5:47 AM | (908) 772-4068 | Elizabeth, NJ | Inco |
| 09/19/17, 5:56 AM | (929) 320-2522 | Stn Is Nyc, NY | Ou |
| 09/19/17, 5:56 AM | (929) 320-2522 | Stn Is Nyc, NY | O |
| 09/19/17, 6:02 AM | (908) 772-4068 | Elizabeth, NJ | Ir |
| 09/19/17, 6:03 AM | (908) 772-4068 | Elizabeth, NJ | ( |
| 09/19/17, 6:03 AM | (908) 772-4068 | Elizabeth, NJ | |
| 09/19/17, 6:13 AM | (347) 994-4044 | Bronx Nyc, NY | |

15a

Distribution 1

Page 1 of 4

# NICE® NICE Inform incident distribution

## Distribution details

| | |
|---|---|
| Distributed by: | COUNTY OF ESSEX |
| Date: | Tuesday, May 22, 2018 12:14:17 PM Eastern Daylight Time |
| Name: | Distribution 1 |
| Description: | initial request |
| Action: | Send to folder or removable media |
| File format: | Separate audio files |
| Audio type: | Standard Audio (*.wav) |
| Video type: | Standard Video (*.avi) |

## Incident details

| | |
|---|---|
| Created by: | NICE Inform |
| Creation date: | Tuesday, May 22, 2018 12:12:08 PM Eastern Daylight Time |
| Name: | 10-04-2017 |
| Number: | c-2017-004776 |
| Description: | cds |
| Start time: | Wednesday, October 04, 2017 12:48:38 PM Eastern Daylight Time |
| End time: | Wednesday, October 04, 2017 2:46:45 PM Eastern Daylight Time |

## Distribution settings

```
... audio certification
... authenticity stamp
... dio only
Include XML file of communication properties
```

## Audio files

Items attached: 61

| Filename | Item reference | Description |
|---|---|---|
| Audio 10278.wav | 10278 | Wednesday, October 04, 2017 12:48:38 PM Eastern Daylight Time, Duration 00:00:16.6890000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10279.wav | 10279 | Wednesday, October 04, 2017 12:48:56 PM Eastern Daylight Time, Duration 00:00:07.5000000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10280.wav | 10280 | Wednesday, October 04, 2017 12:50:34 PM Eastern Daylight Time, Duration 00:00:12.1960000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10281.wav | 10281 | Wednesday, October 04, 2017 12:51:03 PM Eastern Daylight Time, Duration 00:00:25.3180000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10282.wav | 10282 | Wednesday, October 04, 2017 12:51:30 PM Eastern Daylight Time, Duration 00:00:40.8850000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10283.wav | 10283 | |

16a

TULLIES 0183

| | | |
|---|---|---|
| | | Wednesday, October 04, 2017 12:55:30 PM Eastern Daylight Time, Duration 00:00:07.2550000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10284.wav | 10284 | Wednesday, October 04, 2017 12:57:06 PM Eastern Daylight Time, Duration 00:00:10.4480000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10285.wav | 10285 | Wednesday, October 04, 2017 1:00:37 PM Eastern Daylight Time, Duration 00:00:12.6900000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10286.wav | 10286 | Wednesday, October 04, 2017 1:00:55 PM Eastern Daylight Time, Duration 00:00:06.6870000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10287.wav | 10287 | Wednesday, October 04, 2017 1:01:05 PM Eastern Daylight Time, Duration 00:00:06.3770000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10288.wav | 10288 | Wednesday, October 04, 2017 1:01:22 PM Eastern Daylight Time, Duration 00:00:07.2500000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10289.wav | 10289 | Wednesday, October 04, 2017 1:01:50 PM Eastern Daylight Time, Duration 00:00:09.0640000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10290.wav | 10290 | Wednesday, October 04, 2017 1:02:04 PM Eastern Daylight Time, Duration 00:00:12.2580000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10291.wav | 10291 | Wednesday, October 04, 2017 1:02:31 PM Eastern Daylight Time, Duration 00:00:23.5050000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10292.wav | 10292 | Wednesday, October 04, 2017 1:02:55 PM Eastern Daylight Time, Duration 00:00:07.3750000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10293.wav | 10293 | Wednesday, October 04, 2017 1:03:11 PM Eastern Daylight Time, Duration 00:00:16.4420000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10294.wav | 10294 | Wednesday, October 04, 2017 1:19:40 PM Eastern Daylight Time, Duration 00:00:06.9380000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10295.wav | 10295 | Wednesday, October 04, 2017 1:21:27 PM Eastern Daylight Time, Duration 00:00:08.1300000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10296.wav | 10296 | Wednesday, October 04, 2017 1:31:02 PM Eastern Daylight Time, Duration 00:00:06, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10297.wav | 10297 | Wednesday, October 04, 2017 1:31:12 PM Eastern Daylight Time, Duration 00:00:18.6370000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10298.wav | 10298 | Wednesday, October 04, 2017 1:31:34 PM Eastern Daylight Time, Duration 00:00:19.8790000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10299.wav | 10299 | Wednesday, October 04, 2017 1:31:56 PM Eastern Daylight Time, Duration 00:00:05.6890000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10300.wav | 10300 | Wednesday, October 04, 2017 1:35:22 PM Eastern Daylight Time, Duration 00:00:13.8750000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10301.wav | 10301 | Wednesday, October 04, 2017 1:36:22 PM Eastern Daylight Time, Duration 00:00:14.1290000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10302.wav | 10302 | Wednesday, October 04, 2017 1:36:36 PM Eastern Daylight Time, Duration 00:00:06.4430000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio_10303.wav | 10303 | Wednesday, October 04, 2017 1:37:44 PM Eastern Daylight Time, Duration 00:00:15.5030000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |

| Audio 10304.wav | 10304 | Wednesday, October 04, 2017 1:38:46 PM Eastern Daylight Time, Duration 00:00:08.6940000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10305.wav | 10305 | Wednesday, October 04, 2017 1:38:55 PM Eastern Daylight Time, Duration 00:00:06.8770000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10306.wav | 10306 | Wednesday, October 04, 2017 1:39:07 PM Eastern Daylight Time, Duration 00:00:06.8760000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10307.wav | 10307 | Wednesday, October 04, 2017 1:40:10 PM Eastern Daylight Time, Duration 00:00:07.3190000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10308.wav | 10308 | Wednesday, October 04, 2017 1:41:45 PM Eastern Daylight Time, Duration 00:00:06.1880000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10309.wav | 10309 | Wednesday, October 04, 2017 1:42:36 PM Eastern Daylight Time, Duration 00:00:08.3160000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10310.wav | 10310 | Wednesday, October 04, 2017 1:42:47 PM Eastern Daylight Time, Duration 00:00:07.1250000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10311.wav | 10311 | Wednesday, October 04, 2017 1:43:08 PM Eastern Daylight Time, Duration 00:00:10.7520000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10312.wav | 10312 | Wednesday, October 04, 2017 1:43:33 PM Eastern Daylight Time, Duration 00:00:08.1880000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10313.wav | 10313 | Wednesday, October 04, 2017 1:45:31 PM Eastern Daylight Time, Duration 00:00:07.6930000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10314.wav | 10314 | Wednesday, October 04, 2017 1:46:09 PM Eastern Daylight Time, Duration 00:00:05.8750000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10315.wav | 10315 | Wednesday, October 04, 2017 1:46:47 PM Eastern Daylight Time, Duration 00:00:06.0030000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10316.wav | 10316 | Wednesday, October 04, 2017 1:48:38 PM Eastern Daylight Time, Duration 00:00:07.8770000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10317.wav | 10317 | Wednesday, October 04, 2017 1:48:52 PM Eastern Daylight Time, Duration 00:00:09.6900000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10318.wav | 10318 | Wednesday, October 04, 2017 1:52:43 PM Eastern Daylight Time, Duration 00:00:38.7590000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10319.wav | 10319 | Wednesday, October 04, 2017 1:54:04 PM Eastern Daylight Time, Duration 00:00:12.7510000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10320.wav | 10320 | Wednesday, October 04, 2017 1:54:43 PM Eastern Daylight Time, Duration 00:00:06.9380000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10321.wav | 10321 | Wednesday, October 04, 2017 1:55:01 PM Eastern Daylight Time, Duration 00:00:10.0040000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10322.wav | 10322 | Wednesday, October 04, 2017 1:55:15 PM Eastern Daylight Time, Duration 00:00:05.8150000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10323.wav | 10323 | Wednesday, October 04, 2017 1:57:37 PM Eastern Daylight Time, Duration 00:00:07.2500000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10324.wav | 10324 | Wednesday, October 04, 2017 2:00:15 PM Eastern Daylight Time, Duration 00:00:06.9400000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |

| Audio 10325.wav | 10325 | Wednesday, October 04, 2017 2:05:05 PM Eastern Daylight Time, Duration 00:00:27.4430000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
|---|---|---|
| Audio 10326.wav | 10326 | Wednesday, October 04, 2017 2:09:17 PM Eastern Daylight Time, Duration 00:00:08.8790000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10327.wav | 10327 | Wednesday, October 04, 2017 2:09:27 PM Eastern Daylight Time, Duration 00:00:56.2570000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10328.wav | 10328 | Wednesday, October 04, 2017 2:13:58 PM Eastern Daylight Time, Duration 00:00:17.6930000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10329.wav | 10329 | Wednesday, October 04, 2017 2:14:22 PM Eastern Daylight Time, Duration 00:00:18.9520000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10330.wav | 10330 | Wednesday, October 04, 2017 2:14:41 PM Eastern Daylight Time, Duration 00:00:56.3300000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10331.wav | 10331 | Wednesday, October 04, 2017 2:19:51 PM Eastern Daylight Time, Duration 00:00:07.6280000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10332.wav | 10332 | Wednesday, October 04, 2017 2:23:49 PM Eastern Daylight Time, Duration 00:00:07.1920000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10333.wav | 10333 | Wednesday, October 04, 2017 2:23:57 PM Eastern Daylight Time, Duration 00:00:31.0740000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10334.wav | 10334 | Wednesday, October 04, 2017 2:24:32 PM Eastern Daylight Time, Duration 00:00:08.1250000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10335.wav | 10335 | Wednesday, October 04, 2017 2:44:09 PM Eastern Daylight Time, Duration 00:00:18.1310000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10336.wav | 10336 | Wednesday, October 04, 2017 2:44:30 PM Eastern Daylight Time, Duration 00:00:17.5640000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10337.wav | 10337 | Wednesday, October 04, 2017 2:45:07 PM Eastern Daylight Time, Duration 00:00:17.0700000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |
| Audio 10338.wav | 10338 | Wednesday, October 04, 2017 2:45:27 PM Eastern Daylight Time, Duration 00:01:17.6500000, Resource SHERIFF CH2 NEW, Logger 677000000, Channel 5, Logger Call ID 0 |

19a

TULLIES 0186