## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JESSIE TULLIES,

                Petitioner,

     v.

UNITED STATES OF AMERICA,

                Respondent.

Civil Action No. 23-3378 (JXN)

**OPINION**

**NEALS**, District Judge

Before the Court is *pro se* petitioner Jessie Tullies' ("Petitioner") motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 ("Motion"). (ECF No. 1.) Following an order to answer, the United States of America ("Government") responded (ECF No. 9) and Petitioner replied. (ECF No. 10). For the reasons expressed below, the Court **denies** the Motion and **denies** a certificate of appealability.

## I.    BACKGROUND

On June 8, 2019, following a three-day jury trial before Judge Kevin McNulty, U.S.D.J. (ret.), Petitioner was convicted of (1) conspiracy to distribute and possess with intent to distribute heroin, 21 U.S.C. § 846; (2) distribution and possession with intent to distribute heroin, 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); (3) distribution and possession with intent to distribute cocaine base, 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); (4) illegal possession of firearms by a convicted felon, 18

U.S.C. § 922(g)(1); and (5) using and carrying firearms in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A).[1] (*See* Crim. No. 18-21, ECF Nos. 46, 47, 48, 56, 62.)

On June 15, 2018, Petitioner filed a motion for judgment of acquittal (Mot. for Acquittal, Crim. No. 18-21, ECF No. 69), which Judge McNulty denied on November 14, 2018. (Op., Crim No. 18-21, ECF No. 80.) Judge McNulty provided the following detailed summary of the evidence presented at trial in his Opinion denying Petitioner's Motion for a Judgment of Acquittal:

### A. The Prosecution's case

The charges stemmed from the events of a single afternoon, October 4, 2017. An undercover officer saw the defendants engage in two sales of illegal narcotics. The officers apprehended one customer in possession of the heroin he had just purchased. They seized heroin and crack cocaine, as well as three loaded handguns, from a parked car that defendants used as a stash.

The first witness, Detective Yusef Ellis of the Essex County Sheriffs Department, identified defendants [Petitioner] and Williams as the persons he had seen conduct two hand-to-hand narcotics transactions on October 4, 2017. On that date, Det. Ellis testified, he was in Newark, on Weequahic Avenue near Clinton Place, conducting surveillance from an unmarked vehicle. He was alone, but in radio contact with backup officers nearby. [Petitioner] and Williams, he testified, were two of three men he saw there. (Tr. 158)

Det. Ellis saw a green Honda Civic pull up and saw the driver, a white male, speak to [Petitioner]. (Tr. 159-60) Williams then walked up the driveway of 249 Weequahic Avenue and approached a Chevy Lumina with no license plates that was parked there. (Tr. 161-63, 211) He went to the rear bumper of the car, bent down, took out a clear plastic bag, removed some items, and replaced the bag under the car. (Tr. 164-65) He then walked back to the Honda Civic and handed the items to [Petitioner]. Ellis could see that the items were glassine folds, commonly used to package heroin. (Tr. 166) Ellis saw [Petitioner] hand the items to the driver of the Civic, and saw the driver give [Petitioner] cash in exchange. The Civic then drove away. (Tr. 166-67)

An unidentified African-American woman then approached [Petitioner] on foot. (Tr. 170-71) [Petitioner] walked up the

---

[1] Petitioner's co-defendant, Eugene Williams ("Williams") was convicted of the same charges.

driveway of 249 Weequahic, as Williams had done earlier. (Tr. 171) [Petitioner] reached under the rear bumper of the Chevy Lumina, took out a plastic bag, removed items from the bag, and replaced it under the bumper. (Tr. 172) [Petitioner] then walked back to the unidentified woman. (Tr. 173) When [Petitioner] opened his hand, Ellis again could see that the items were glassine folds. The woman handed [Petitioner] cash, which he placed in his pocket. (Tr. 174) The woman then walked away. (Tr. 174-75)

Ellis radioed the backup officers and described where [Petitioner] and Williams were standing. At this point, some five minutes had passed since the hand-to-hand transactions. (Tr. 177)

Detectives Evans and Pearce appeared and arrested [Petitioner] and Williams. (Tr. 178) When arrested, [Petitioner] possessed $1275 in currency and Williams possessed $360 in currency. (Tr. 252-58)

Ellis radioed a brief description of the unidentified woman purchaser and the Civic driver to the backup officers. (Tr. 175-76) The unidentified woman was not found, but Detective Docke pulled over the green Civic nearby, on Lyons Avenue. (Tr. 304, 306) The driver was identified as John Potts. (Tr. 309) Potts surrendered two glassine envelopes of heroin, bearing the brand stamp "Black Jack." (Tr. 309-11) Docke radioed back to Ellis, reporting the results of the stop, and then drove to the Weequahic location. (Tr. 176-77, 311)

Ellis directed Detectives Rals and Docke to the Chevy Lumina. (Tr. 178-79) Together they searched the Lumina and the surrounding area. (Tr. 235) From under the rear bumper of the car, Ryals personally recovered "jugs" (small plastic containers) of crack cocaine and a loaded handgun with ammunition. (Tr. 236-43, 317-18) Detective Docke recovered from under the bumper a bag containing glassine envelopes of heroin, rubber-banded in bundles of ten, and stamped with the brand name "Black Jack." (Tr. 243-47, 313-16) The brand-stamp "Black Jack" matched the stamp on the two envelopes seized from Potts. (Tr. 259-60) Docke also recovered from under the bumper two additional loaded handguns. (Tr. 247-52, 316-17)

The parties stipulated that the drugs were analyzed and found to consist of 3.714 grams of heroin and .563 grams of cocaine base. (Tr. 371-72) The guns were identified as a Beretta BU9, serial number NU068181; a Taurus Millennium PT111 G2, serial number TGU47186; and an FEG 9mm, serial number AG0726. (Tr. 343, 347-49, 354; GE 4, 5, 6) Agent Casanova of the Bureau of Alcohol, Tobacco, and Firearms confirmed that the seized guns were

3

operable, that they fit the statutory definition of a firearm, and that the guns and ammunition were manufactured outside the State of New Jersey and hence had traveled in interstate commerce. (Tr. 332-58)

Agent Havens of the FBI testified in the capacity of an opinion witness on "methods used by drug dealers to conduct street-level drug business to include the distribution, packaging, pricing, and storage of the drugs, and also the use of firearms in furtherance thereof." (Tr. 382) He described packaging of heroin in decks, bundles, and bricks, as well as the use of brand-name stamps; the packaging of cocaine base (crack cocaine) in jugs; prevailing prices in Newark; and related matters. Havens testified that street-level drug dealers will typically set up a territory, often on a quiet block, will protect that territory, and will generally permit only one brand to be sold within that territory. Transactions, he explained, are generally done in cash, and often in small bills, which may be traded in for larger bills at local businesses such as bodegas. The packaging of the drugs and the currency seized in this case, he opined, were typical. (Tr. 374-398) Havens testified that street-level dealers do not want to be caught in physical possession of drugs, so they typically stash them at a location which they can monitor. They then retrieve amounts as necessary for sales. To maintain deniability, the location would typically not be owned by or traceable to the dealer. The facts of this case, he opined, fit that pattern. (Tr. 398-401)

Havens testified further that guns are tools of the narcotics trade. They are used to protect the drugs and the territory, to defend against robbery, and to guarantee payment. Guns will sometimes be stashed with the drugs they are meant to protect; here, too, the dealer may want to avoid being caught in physical possession of a firearm. Once again, Havens testified that the pattern fit the facts of this case. (Tr. 401-04) Semi-automatic handguns like the ones seized here, he testified, are typical and well-suited to the purposes for which street-level drug dealers use them, such as defense, protection of the stash, or discouragement of robbery. (Tr. 404-06)

In the bifurcated second phase of the case, the government introduced a stipulation that each of the defendants had a prior, unspecified felony conviction. (Tr. 587-90, Tr. 636-39)

## B. The Defense's Case

Leanna Travers, defendant [Petitioner]'s daughter, testified that on October 4, 2017, she went to Weequahic Avenue with her friend, Stephanie Davis. She went there to meet [Petitioner], who was to

4

give her some money for work shoes. (Tr. 444-45, 449) [Petitioner] pulled up in a car, got out, and walked toward a car that was parked behind the one in which Travers was sitting. [Petitioner] spoke to two females, and then walked toward Travers's car, where Travers was still sitting. At that point the police arrived and blocked everybody in. (Tr. 445) [Petitioner] was handcuffed and arrested. (Tr. 446)

Stephanie Davis testified that on October 4, 2017, she drove to Weequahic Avenue with Leanna Travers, her best friend. They parked and waited for [Petitioner]. The car of Travers's cousin was parked behind them. (Tr. 435-37) [Petitioner] pulled up in a light blue car and parked on the opposite side of the street. (Tr. 437-38) Multiple police cars with flashing lights then arrived, and the police took everyone's car keys. [Petitioner] was handcuffed behind the Davis/Travers car and then placed in a police car. (Tr. 439) Asked on cross-examination why they went to Weequahic Avenue to look for [Petitioner], Davis agreed that it was the location where he usually hangs out. (Tr. 442)

John Potts, the driver of the green Civic, testified that he drove to Weequahic Avenue on October 4, 2017. A now-recovering heroin addict, he admitted that he went there to buy drugs. (Tr. 451) The persons who sold him the drugs, he said, were not [Petitioner] and Williams but "younger kids," whom he described as two skinny black males, 6 feet in height, around 18 to 20 years old. (Tr. 452-53) He testified that he recognized [Petitioner] and Williams only from having been arrested with them.

Dina Blackwell, who identified [Petitioner] as her fiancé, testified. As for the $1275 possessed by [Petitioner], she stated that it was intended for a rental deposit on a house. She testified that, although she later saw Potts in municipal court, she did not have a conversation with him. (Tr. 484-87)

Audrey Blackwell is the mother of Dina Blackwell, whom she identified as [Petitioner]'s wife. Audrey Blackwell did not witness the events, but corroborated that [Petitioner] had borrowed her car, a Nissan Altima, on October 4, 2017. Following the arrests, she recovered the car from the police at Weequahic Avenue. (Tr. 479-82)

(Op. at 1-6.)

On August 19, 2019, Judge McNulty sentenced Petitioner to an aggregate term of 235-months imprisonment. (J. of Conviction, Crim No. 18-21, ECF No. 104.) On August 23, 2019, Petitioner filed a Notice of Appeal of the Judgment of Conviction in the Third Circuit Court of Appeals. (Notice of Appeal, Crim No. 18-21, ECF No. 106.) The Third Circuit affirmed Petitioner's conviction and sentence on February 10, 2022. *United States v. Tullies*, No. 19-2957, 2022 WL 413945 (3d Cir. Feb. 10, 2022.)

On May 2, 2023, Petitioner filed the instant Motion raising five claims of ineffective assistance of trial counsel, James R. Murphy, Esq. ("Murphy"), and one claim that the cumulative effect of Murphy's errors establishes prejudice. (ECF No. 1.) The Government opposed (ECF No. 9) and Petitioner replied (ECF No. 10).

## II.    LEGAL STANDARD

### A.  28 U.S.C. § 2255

A federal prisoner may file a motion under 28 U.S.C. § 2255 to challenge the validity of his or her sentence. Section 2255 provides in relevant part that:

> [a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief, the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice," or "an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003). A district court must

hold an evidentiary hearing on a § 2255 motion unless the "motion and the files and records of the case conclusively show" that the movant is not entitled to relief. 28 U.S.C. § 2255(b); *see also United States v. Booth*, 432 F.3d 542, 545-46 (3d Cir. 2005).[2]

## B. Ineffective Assistance of Counsel

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court articulated a two-prong test for proving counsel is ineffective. First, a petitioner must show that considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an ineffectiveness claim considering all circumstances) (citation omitted). A petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See Strickland*, 466 U.S. at 690. The Court's scrutiny of counsel's conduct is "highly deferential." *See id.* at 689. Indeed, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The Court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If counsel makes a "thorough investigation of law and facts" about his plausible options, the strategic choices he makes accordingly are "virtually unchallengeable." *Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425,

---

[2] Rule 4(b) states, in relevant part:

> The motion, together with all the files, records, transcripts, and correspondence relating to the judgment under attack, shall be examined promptly by the judge to whom it is assigned. If it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief in the district court, the judge shall make an order for its summary dismissal[.]

*United States v. Thomas,* 221 F.3d 430, 437 (3d Cir. 2000) (quoting Fed.R. § 2255 Proceedings 4(b).)

1432 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91). If, on the other hand, counsel pursues a certain strategy after a less than complete investigation, his choices are considered reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).

Second, the petitioner must affirmatively prove prejudice. *See* 466 U.S at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBridge v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 n.11 (3d Cir. 2012). "This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (internal quotation marks and citations omitted). The Court, however, can evaluate the *Strickland* prongs in either order; "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland*, 466 U.S. at 697).

## III.    DISCUSSION

Petitioner raises five claims of ineffective assistance of trial counsel in his Section 2255 Motion.

### A.  Ground One: Ineffective Assistance of Trial Counsel, Calling Defense Witness

In his first ground for relief, Petitioner argues that trial counsel was ineffective for calling Petitioner's fiancé, Dina Blackwell ("Blackwell"), as a defense witness at trial. (Moving Br. at 11-

22, ECF No. 1.) Petitioner claims Blackwell's testimony "provided negligible benefit" to Petitioner and trial counsel should have known "the overall impact of [her] testimony would be devastating to the defense." (*Id.* at 19.) Petitioner argues that through witnesses Leanna Travers, Stephanie Davis, and John Potts, the defense "called into question the veracity of law-enforcement witness," yet Blackwell's testimony led "the jury to conclude that [Petitioner] was trying to manipulate Potts to provide untruthful testimony to aid the defense." (*Id.* at 11-22.)

Where a petitioner challenges his counsel's decision as to which witnesses to call, courts "are 'required not simply to give [the] attorney[ ] the benefit of the doubt, but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as [he] did.'" *Branch v. Sweeney*, 758 F.3d 226, 235 (3d Cir.2014). *Strickland* requires a defendant "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." 466 U.S. at 689. And Petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Arrington*, 13 F.4th 331, 335 (3d Cir. 2021) (quoting *Strickland*, 466 U.S. at 694). Petitioner fails to show that but for Blackwell's testimony, the outcome of Petitioner's trial would have been different.

At trial, defense counsel called Blackwell to testify. When asked if Blackwell knew why Petitioner had $1275.00 in cash at the time of his arrest, Blackwell testified she "called him to come pick the money up because [they were] putting a deposit down on a house." (Trial Tr. at

486:3-5, ECF No. 9-1.) Defense counsel also asked Blackwell if she saw defense witness John

Potts[3] when she went to Municipal Court. Blackwell testified as follows:

> Q. At that time that you went to Municipal Court, did you see Mr.
>    Potts?
>
> A. The first time I went, he wasn't there.
>
> Q. Did you see -- did there come a time when you did see Mr. Potts?
>
> A. The second time when I went with the investigators.
>
> Q. And that was my investigator?
>
> A. Yes.
>
> Q. That's the gentleman sitting back there –
>
> A. Yes.
>
> Q. -- in the first row. And did you -- other than -- did you have any
>    conversations with Mr. Potts yourself?
>
> A. No.

(*Id.* at 486:21-487:9.) At sidebar, the prosecution explained the Government possessed many jail

calls between Petitioner and Blackwell, and they wished to cross-examine her about the calls. (*Id.*

at 487:15-25.) Defense counsel acknowledged Petitioner called Blackwell approximately 700

times. (*Id.* at 489:5-7.) However, when questioning Blackwell, the prosecution did not address the

fact that the calls were recorded because Blackwell admitted to the contents of the calls. (*See*

*generally id.* at 490:5-495:5.) On cross-examination, Blackwell contradicted her initial testimony

that she did not see Potts the first time she went to Municipal Court. Instead, she admitted she

pulled him aside and her daughter took his phone number. Blackwell testified as follows:

> BY MR. NAVARRO:

---

[3] As explained above, Potts was stopped by police and arrested after Detective Ellis witnessed a hand-to-hand drug transaction between Potts and Petitioner. The defense called Potts as a witness at trial. As explained in more detail below, Potts testified at trial that Petitioner and his co-defendant were not the individuals who sold him the drugs.

Q. Good afternoon, Miss Blackwell.

A. Good afternoon.

Q. You said you're [Petitioner's] fiancée?

A. Yes.

Q. You've known him, I think you said, 22 years?

A. Or more.

Q. Fair to say you care about him?

A. Yes.

Q. Fair to say you love him?

A. Yes.

Q. Fair to say you don't want to see him go to jail?

A. Absolutely not.

Q. And fair to say you'd do anything you could to help keep him out of jail?

A. Yes.

Q. You've spoken to him multiple times since he was arrested on October 4, 2017, haven't you?

A. Yes.

Q. How many times do you believe you've spoken to him?

A. I'm not sure.

. . .

Q. More than a thousand?

A. Probably so. He calls.

Q. How about Mr. Williams? Have you spoken to him since he was arrested on October 4?

A. A few times.

Q. How many?

A. I'm not sure.

Q. Have you ever had a conference call with both of them?

A. I believe, yes. Maybe.

Q. You've, in fact, helped arrange a conversation between the two of them?

A. Yes.
. . .

Q. In those perhaps thousands of conversations that you've had with [Petitioner], he asked you to find John Potts, didn't he?

A. Yes.

Q. He asked you to search for him online?

A. Yes.

Q. He asked you to send John Potts a Facebook message?

A. Yes.

Q. And you did send him a Facebook message?

A. I believe I did.

Q. He asked you to go to John Potts' court appearances.

A. He said he -- that he tell him come to court, but I received a letter from the court saying he was going to be in court.

Q. I understand that you received a letter, ma'am, but I'm asking you, [Petitioner] also asked you to go to John Potts' court appearances; isn't that right?

A. Yes.

12

Q. He asked you to go to the court appearances and speak to him about this case, right?

A. Yes.

Q. And he asked you to do all of these things multiple times?

A. Yes.

Q. On his behalf?

A. Yes.

Q. And he asked you to write up what John Potts should say, right?

A. Yes.

Q. He asked you to take a photo, to get John Potts' identification, and take a photo of it, didn't he?

A. Yes.

Q. And so you did, in fact, go to the court appearances multiple times and speak to Mr. Potts?

A. I never spoke to Mr. Potts.

Q. You never spoke to Mr. Potts?

A. No.

Q. You did pull him aside, though, right?

A. When we first went to court the first time, when he was on the Municipal Court, not the second one -- the first one when they all got arrested, I did go to court then.

Q. And you did pull him aside?

A. Yes.

Q. And he gave you his phone number?

A. No, he didn't give me his phone number that time.

Q. Did he give you contact information?

13

A. He -- I spoke to him outside. He actually gave it to my daughter. He didn't give it to me.

Q. But -- so -- but when you pulled him aside, you spoke to him, it was just the two of you at that moment?

A. Me, myself and my daughter.

Q. And your daughter?

A. My daughter, yes.

Q. What's your daughter's name?

A. My daughter's name is Amaya (phonetic).

Q. Amaya what?

A. Amaya Smith.

(*Id.* at 490:5-494:7.)

As to the first *Strickland* prong, a review of the trial transcript shows defense counsel's decision to call Blackwell as a witness could be considered sound trial strategy. Petitioner acknowledges defense counsel called Blackwell to testify as to why Petitioner had a large amount of cash on him. (Moving Br. at 18.) Calling a witness to testify that Petitioner had cash for a reason other than selling drugs is reasonable trial strategy.

However, assuming *arguendo* that trial counsel's decision to call Blackwell, knowing the government had recordings of the calls between Petitioner and Blackwell, was not the result of reasonable professional judgment, Petitioner is unable to prove the prejudice required under *Strickland*. Petitioner is unable to show that but for Blackwell's testimony that she approached Potts on two occasions at the request of Petitioner, the result of his trial would have been different.

While Blackwell did testify Petitioner asked her to seek out Potts, she also testified that while she saw Potts, she never spoke to him. She testified that the first time they met, her daughter

got his contact information, and the second time, Potts only spoke with the investigator. Moreover, the jury had already been informed that Blackwell approached Potts on two occasions. Prior to Blackwell testifying, the defense called Potts as a witness. Potts testified that on October 4, 2017, he drove his Honda Civic to Weequahic Avenue to purchase drugs. (Trial Tr. at 451:5-452:3.) Potts testified the individuals who sold him the drugs were "younger kids," who were skinny, around six feet tall, and black. (*Id.* at 452:25.) Potts admitted the police stopped his vehicle and arrested him after he gave them the drugs he purchased. (*Id.* at 454:3-13.) After his arrest, Potts was driven in the back of a police vehicle back to Weequahic Avenue. (*Id.* at 454:14-15.) Potts testified he saw Petitioner and Williams for the first time when he was brought back to Weequahic and they were placed in the police vehicle with him. (*Id.* at 454:16-20.) When asked if Petitioner sold him drugs that day, Potts answered "absolutely not." (*Id.* at 455:10.)

On cross-examination, Potts responded as follows:

BY MR. NAVARRO:

> Q. So you gave the defense the courtesy of telling them what happened but not the government?
>
> A. Yeah.
>
> Q. And you spoke with the defense how many times?
>
> A. Once.
>
> Q. And you also spoke with [Petitioner's] family members, didn't you?
>
> A. No.
>
> Q. You've never spoken to [Petitioner's] family?
>
> A. No.
>
> Q. Never?
>
> A. No.

Q. Spoken to his friends, ever?

A. No.

. . .

Q. Now, you know [Petitioner's] girlfriend, don't you?

A. No, I don't.

Q. Maybe you know her as his wife or some other moniker.

A. Yeah, I've met her before.

Q. Her name is Dina, right?

A. I have no idea.

Q. Where did you meet her?

A. At the courthouse, I think.

Q. So when you testified earlier that you had never spoken to [Petitioner's] friends or family, that was a lie?

A. No, it wasn't a lie. I mean, I just met her. That's about it. I didn't speak about the case or nothing.

Q. I asked you if you ever communicated with [Petitioner's] friends or family and you stated no. That was not truthful, correct?

A. Okay. Yeah.

Q. Now, you said you met her at the courthouse?

A. Yeah.

Q. At one of your court appearances?

A. Yeah, the first one.

Q. So it's your testimony that one of [Petitioner's] -- how did you know her by, the girlfriend, wife?

A. What was that?

16

Q. How did you know her as, like his girlfriend, his wife, his friend?

A. I didn't ask.

Q. So she approached you at one of your court appearances on your case?

A. Yeah.

Q. And you were not a co-defendant with them, correct?

A. Yes, I was.

Q. You were a co-defendant with them?

A. Yeah. In the first municipal case, I guess it was co-defendant.

Q. So as a co-defendant, you know that they were charged with selling you drugs and having guns as well?

A. At that court date I found that out.

Q. You found out that they were charged with selling drugs and with having guns?

A. Yeah.

. . .

Q. But, at that court date, when you found out that these two men were charged with guns and drugs, you didn't turn to anyone and say it wasn't those guys?

A. Yes, I did.

Q. You did in court that day?

A. Not in court, no.

Q. So who -- you -- let me -- in court, did you tell anyone it wasn't those guys?

A. Not on that court date, no.

Q. Today is the first time you're doing that, the first time you're doing that in court, right?

A. In court, yeah.

17

Q. Now, you said that she showed up at your court date. How did she know to show up at your court date?

A. I have no idea.

Q. And she actually -- she told you that she tried to contact you via Facebook; isn't that right?

A. Not that I remember.

Q. You don't remember -- you never received a message from her via Facebook?

A. No, not that I remember.

Q. But she -- so she just showed up on your court date?

A. I guess.

Q. She showed up at your court appearances more than once, right?

A. No.

Q. Just once?

A. Yeah.

Q. Was she by herself?

A. I believe so.

Q. No one -- no one else was with her?

A. I believe so. I don't know. I don't remember.

Q. When she showed up at your court appearances, she pulled you aside, right?

A. Yeah.

Q. She spoke to you about this case?

A. I don't remember the conversation quite well. It was a long time ago.

Q. Is it your testimony she spoke to you about something beside this case?

A. I don't know. I don't remember the conversation, to be honest with you.

Q. You don't remember how she introduced herself?

A. Not really, no.

Q. So it was just you and her?

A. I believe so, yeah.

Q. Your lawyer wasn't there?

A. No.

Q. Defense counsel here weren't there?

A. No.

Q. No investigators were there?

A. No.

Q. Just the two of you having a private conversation at your court appearance?

A. Yeah.

Q. She got your phone number, right?

A. I don't think -- I don't think I gave her my number.

Q. She tried to get you to sign something, didn't she?

A. I didn't sign anything.

Q. I didn't ask you if you signed anything. I said, she tried to get you to sign something?

A. Not that I remember.

Q. But, regardless, it was only after speaking to her that you started telling people that the defendants didn't sell you the drugs, right?

A. What do you mean by "people"?

Q. Anyone on the planet.

A. No.

Q. You didn't tell anyone on the planet that these defendants didn't sell you the drugs until after you spoke to [Petitioner] friend; is that right?

A. Yeah.

(*Id.* at 457:7-474:17.)

On recross-examination, Potts admitted that on a second occasion, he was again approached by Blackwell, along with a defense investigator. Potts testified as follows:

BY MR. MURPHY:

Q. There were a series of questions about meeting Dina Blackwell at a Municipal Court appearance. Did you also meet my investigator that day? There was another -- a male investigator discussed the case with you, asked if you would testify?

A. Oh, yes, that was the second time. The second time that I -- that was at the -- the court date where I got the community service.

Q. And you met my investigator with Dina Blackwell, correct?

A. Yeah. Uh-huh.

Q. You had your lawyer there with you; is that correct?

A. Correct. Yeah. Uh-huh.

Q. And my investigator spoke with you and your lawyer with regard to your testimony here today, correct?

A. Correct.

Q. Dina Blackwell wasn't present for that discussion, was she?

A. No. It was just the investigators and my lawyer and me.

Q. And that was in Newark Municipal Court?

A. Yeah.

Q. And how many times did you appear in Newark Municipal Court?

A. Whew, about three or four, maybe.

Q. How many times was Ms. Dina Blackwell there?

A. Just that one time.

Q. That was with the investigator?

A. Yeah.

Q. Did she talk to you about the case at all?

A. The investigators talked to me about the case.

(*Id.* at 477:20-478:23.) Potts then testified he was "100 percent sure" that Petitioner and Williams did not sell him drugs on October 4, 2017. (*Id.* at 479:7.)

Prior to Blackwell testifying, the jury already heard testimony that Blackwell approached Potts on two separate occasions. Therefore, the Court finds Petitioner has failed to prove a reasonable probability that but for Blackwell's testimony that she approached Potts at Petitioner's request, the outcome of his trial would have been different. *Strickland*, 466 U.S. at 694.

Additionally, considering the significant evidence against Petitioner, including Detective Ellis's eyewitness testimony, Petitioner has failed to prove the prejudice prong of *Strickland*. As summarized above, prosecution witness Detective Ellis testified he saw Petitioner conduct two hand-to-hand drug sales on October 4, 2017. Detective Ellis testified he was conducting surveillance in an unmarked vehicle when he saw Petitioner and two other men. (Trial Tr. at 150:1-151:2, 158:3-20.) During surveillance, Detective Ellis saw the driver of a green Honda Civic stop and speak to Petitioner. (*Id.* at 160:18-23.) Detective Ellis testified that after the Honda Civic driver spoke with Petitioner, Petitioner's co-defendant, Williams, walked across to the driveway of 249 Weequahic Avenue and approached a parked vehicle. (*Id.*) Detective Ellis testified Williams went to the "rear bumper of the car, bent down, grabbed a clear plastic bag from the car, gathered some items from this plastic bag, and then placed the bag back under the vehicle." (*Id.* at 164:4-9.)

21

Williams returned to Petitioner and the Honda Civic, handed the items to Petitioner, and Petitioner handed them to the driver of the Civic in exchange for money. (*Id.* at 166:3-9.) Detective Ellis stated he could see the items Petitioner gave to the driver of the Civic were glassine folds used to package heroin. (*Id.* at 166:17-23.)

Detective Ellis then testified he saw a woman approach Petitioner, and following a conversation, Petitioner went to the car parked in the driveway of 249 Weequahic Avenue and removed more items from the plastic bag under the car's bumper. (*Id.* at 170:23-172:9.) Petitioner returned to the woman and handed her glassine folds in exchange for cash. (*Id.* at 173:11-174:16.)

Detective Ellis informed the backup officers what he observed, and Detective Docke located the Honda Civic. (Id. at 175:14-176:3.) "Detective Docke conducted a motor vehicle stop," "recovered heroin from the vehicle," and radioed Detective Ellis "that he had a positive buy from the driver of that vehicle." (*Id.* at 177:7-15.)

Detective Ellis testified approximately five minutes passed between the hand-to-hand drug transactions and when Detective Docke radioed that he recovered heroin from the Honda Civic. (*Id.* at 177:23.) Detective Ellis informed other units about Petitioner's location and requested officers arrest Petitioner and Williams for selling narcotics. (*Id.* at 177:24-178:5) At that time, Petitioner and Williams were taken into custody. (*Id.* at 178:10-11.) Detectives Docke and Ryals then searched the rear bumper of the car parked in the driveway of 249 Weequahic Avenue and found narcotics. (*Id.* at 179:3-11.)

Detective Ryals testified next for the Government. Detective Ryals testified he and Detective Docke recovered glassine envelopes containing heroin with the brand stamp "Black Jack," and three firearms from the rear bumper of the vehicle parked in the driveway of 249 Weequahic Avenue. (*Id.* at 236:5-7, 243:4-244:7, 246:8-247:4.) Detective Ryals also testified that

22

at the time of Petitioner's arrest, Petitioner had $1275.00 on his person. (*Id.* at 256:25.) Detective Docke also testified for the prosecution and stated the narcotics recovered from Potts bore the brand stamp "Black Jack." (*Id.* at 310:16-20.)

Considering the overwhelming evidence against Petitioner, Petitioner cannot show he was prejudiced by counsel's decision to call Blackwell as a defense witness. *See Albrecht v. Horn*, 485 F.3d 103, 129 (3d Cir. 2007) ("The ample if not overwhelming evidence of Albrecht's guilt . . . supports the conclusion that he suffered no prejudice as a result of counsel's deficient performance . . .."). Petitioner is not entitled to habeas relief on this claim.

### B.  Ground Two: Ineffective Assistance of Trial Counsel, Failure to Call Investigator

Next, Petitioner argues trial counsel was ineffective for failing to call the defense investigator as a witness. (Moving Br. at 22.) Petitioner claims that after Blackwell's testimony, counsel should have called the defense investigator to "bolster [Blackwell's] credibility" and testify that Blackwell did not "participate in the conversation with [Potts.]" (*Id.* at 24-25.) Petitioner argues trial counsel was ineffective for failing to call the investigator to verify that "Blackwell did not put any pressure on Potts." (*Id.* at 23.)

Preliminarily, the Court notes that Petitioner has failed to provide a sworn statement as to what testimony the investigator would have given at trial. In *Duncan v. Morton*, 256 F.3d 189, 202 (3d Cir. 2001), the Third Circuit found a habeas petitioner's failure to present any sworn testimony by a witnesses the habeas petitioner claimed counsel should have called as a witness precluded the petitioner from establishing *Strickland* prejudice. In the § 2255 context, other courts have similarly found a petitioner must provide a sworn statement of fact from the proposed witness about their proposed testimony to establish *Strickland* prejudice. *See Huggins v. United States*, 69 F. Supp. 3d 430, 446 (D. Del. 2014) (noting that movant did not provide an affidavit from the witness stating

that he would have been available to testify and or describing his potential testimony); *Tolentino v. United States*, No. 13-4168, 2014 WL 3844807, at *3 (D.N.J. July 31, 2014) ("[A petitioner's] failure to include a sworn statement regarding the nature of [a witness's] proposed testimony is fatal to his making a prima facie showing of prejudice."). Petitioner's failure to provide a sworn statement as to the defense investigator's intended testimony prevents Petitioner from being able to show that he suffered any prejudice by counsel's failure to call the investigator as a witness.

In any event, testimony that Blackwell was part of the conversation between Potts and the investigator would have been of limited evidential value. As explained at length above, both Potts and Blackwell testified that Blackwell initially approached Potts *without* the investigator. Therefore, the investigator could not have testified to what conversations took place during Potts and Blackwell's first interaction. Furthermore, both Potts and Blackwell testified that at the second meeting, Potts and the investigator spoke without Blackwell present. As the jury had already heard testimony that Blackwell approached Potts twice and on the second occasion Potts spoke privately with the investigator, any testimony from the investigator would have had little, if any, likelihood of impacting the outcome of Petitioner's case. Petitioner has failed to show that he was prejudiced by trial counsel failure to call the defense investigator as a witness at trial. Therefore, Petitioner's § 2255 Motion is dismissed as to this claim.

## C. Ground Three: Ineffective Assistance of Trial Counsel, Failure to Object to Expert Testimony

In his third ground for habeas relief, Petitioner argues trial counsel was ineffective for failing to object to the testimony of Federal Bureau of Investigations Special Agent John Havens, Jr. ("Agent Havens"), who testified as an expert on behalf of the government. (Moving Br. at 25-29.) Petitioner claims that trial counsel should have objected to Agent Havens' testimony because it "directly commented on the mens rea of the defendants in violation of [Federal Rules of

Evidence] 704(b)." (*Id.* at 25.) Petitioner argues that because Havens expressed his opinion that the facts of Petitioner's case fit the pattern of drug dealing and illegal gun possession, the "expert improperly referred to [Petitioner's] intent to sell illegal drugs." (*Id.* at 26-27.)

Federal Rule of Evidence 704 prevents an expert in a criminal case from "stat[ing] an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged." Fed. R. Evid. 704(b). This rule does not prevent an expert from giving testimony that "supports a conclusion that the defendant had the necessary state of mind" as long as the expert does not "draw the ultimate conclusion for the jury." *United States v. Davis*, 726 F.3d 434, 446 (3d Cir. 2013). In drug cases, "[i]t is well established that experts may describe, in general and factual terms, the common practices of drug dealers" including the quantity, purity, usual dosage units, and street value of narcotics without running afoul of Rule 704. *United States v. Watson*, 260 F.3d 301, 308-09 (3d Cir. 2001); *see also Davis*, 726 F.3d at 446 (affirming a district court's ruling admitting testimony from a drug expert when the expert "spoke about common practices."). In *Watson*, the Third Circuit stated that "Rule 704(b) may be violated when the prosecutor's question is plainly designed to elicit the expert's testimony about the mental state of the defendant, or when the expert triggers the application of Rule 704(b) by directly referring to defendant's intent, mental state, or mens rea." *Id.* at 309 (citations omitted).

Here, Special Agent Havens testified as an "expert witness in the area of the methods used by drug dealers to conduct street-level drug business to include the distribution, packaging, pricing, and storage of drugs, and also the use of firearms in furtherance thereof." (Trial Tr. at 382:10-15.) Judge McNulty summarized Haven's relevant testimony as follows:

> He described packaging of heroin in decks, bundles, and bricks, as well as the use of brand-name stamps; the packaging of cocaine base (crack cocaine) in jugs; prevailing prices in Newark; and related matters. Havens testified that street-level drug dealers will typically

set up a territory, often on a quiet block, will protect that territory, and will generally permit only one brand to be sold within that territory. Transactions, he explained, are generally done in cash, and often in small bills, which may be traded in for larger bills at local businesses such as bodegas. The packaging of the drugs and the currency seized in this case, he opined, were typical. (Tr. 374-398) Havens testified that street-level dealers do not want to be caught in physical possession of drugs, so they typically stash them at a location which they can monitor. They then retrieve amounts as necessary for sales. To maintain deniability, the location would typically not be owned by or traceable to the dealer. The facts of this case, he opined, fit that pattern. (Tr. 398-401)

Havens testified further that guns are tools of the narcotics trade. They are used to protect the drugs and the territory, to defend against robbery, and to guarantee payment. Guns will sometimes be stashed with the drugs they are meant to protect; here, too, the dealer may want to avoid being caught in physical possession of a firearm. Once again, Havens testified that the pattern fit the facts of this case. (Tr. 401-04) Semi-automatic handguns like the ones seized here, he testified, are typical and well-suited to the purposes for which street-level drug dealers use them, such as defense, protection of the stash, or discouragement of robbery. (Tr. 404-06)

(Op. at 3-4.)

Agent Havens testified that the area where Detective Ellis saw Petitioner standing and where the drugs were stashed in the driveway of 249 Weequahic Avenue is consistent with a typical stash location. (*See* Trial Tr. at 401:1-13.) When asked why it was a typical stash location, he answered "you can see the location from across the street and it's still easily accessible." (*Id.* at 401:15-16.) Agent Havens also testified:

> Q. In this case the government has alleged that the defendants stashed three guns, along with the drugs I showed you earlier, in the bumper of that same car. What, if any, conclusions can you draw from that?
>
> A. That the drugs were stashed at that location to be hidden from law enforcement, but to be accessible.
>
> Q. What about the guns?

> A. As well as the guns, they were put there to protect the stash and to protect the sellers.

(*Id.* at 404:1-9.)

Petitioner argues that because Agent Havens expressed his opinion that the facts of "this very case fit the pattern of drug dealing and illegal gun possession, the expert improperly referred to [Petitioner's] intent to sell illegal drugs." (Moving Br. at 26-27.) The Court disagrees.

Agent Havens' testimony did not draw the ultimate inference or conclusion for the jury and therefore did not violate Rule 704(b). His testimony was based on only the external circumstances surrounding Petitioner's arrest, i.e., the amount of drugs, the storage of the drugs, to location of the drugs, the location of defendants, the storage of guns with the drugs. Agent Havens did not testify that he participated in the surveillance or arrest of Petitioner. Rather, he testified that the area in question fit the common practices of drug dealers and based on the facts presented to him, the drugs and guns were placed under the bumper of the car to be hidden from police and to protect the sellers of the drugs. Agent Havens did not testify to Petitioner's state of mind. While Agent Havens' testimony supports the conclusion that a person stashing drugs and guns may have the intent to sell the drugs, the testimony did not "draw the ultimate conclusion for the jury." *Davis*, 726 F.3d at 446.

An attorney's failure to raise a meritless objection or present a meritless argument does not amount to constitutionally ineffective assistance. *See United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999) ("There can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument."). As Agent Havens' testimony did not violate Rule 704, any objection to his testimony would have been meritless. Thus, trial counsel's failure to raise a meritless objection to Agent Havens' testimony did not amount to constitutionally ineffective assistance and this claim is denied.

**D.  Ground Four: Ineffective Assistance of Trial Counsel, Failure to Introduce Phone Records**

Petitioner argues trial counsel was ineffective for not introducing Petitioner's cell phone records at trial. (Moving Br. at 29-31.) In the sentencing memorandum, counsel explained he did not introduce Petitioner's cellphone records because "the calls were made to and by [Petitioner]," so "[Petitioner] would need to testify as to the calls." (*Id.* at 29-30.) Petitioner claims this was an "erroneous view of the law." (*Id.* at 29.) Petitioner argues the phone records would have shown that Petitioner was not "where the government witnesses said he was at the critical time of the events at bar." (*Id.* at 30.)

The Court need not decide if trial counsel incorrectly believed the cell phone records were only admissible if Petitioner testified, because Petitioner has failed to prove prejudice as required under *Strickland*. *See Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010) ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . ."). Petitioner claims that before trial he informed counsel that he was on the phone "prior to arriving at the scene of [his] arrest." (Moving Br. at 29.) Petitioner argues his phone records would have also shown he was on the phone at the same time law enforcement claimed the drug sales occurred. (*Id.* at 30.) Petitioner states that because Detective Ellis did not testify that Petitioner was on the phone during Ellis' surveillance of him, the phone records "directly undermine" Ellis's testimony. (*Id.*)

Although Detective Ellis did not testify that Petitioner took or made phone calls during his surveillance, the Court notes Ellis did not affirmatively testify that Petitioner was not on the phone during that time. Petitioner fails to explain how being on the phone during a drug deal proves he was not at the drug deal. Detective Ellis testified he witnessed Petitioner participate in the drug transactions. (Trial Tr. at 160:16-174:24.) Detective Ellis informed other backup units of

28

Petitioner's location and requested officers arrest Petitioner and Williams for sales of narcotics. (*Id.* at 177:17-178:5.) At that time, Petitioner and Williams were taken into custody. (*Id.* at 178:10-11.) Simply put, police saw Petitioner deal drugs. They did not testify about whether Petitioner was on the phone. Petitioner does not explain how his cell phone records would show he was not, in fact, dealing drugs.

Accordingly, Petitioner has failed to establish he was prejudiced by trial counsel's failure to introduce his cell phone records. *Strickland* demands more than pure speculation –it requires a showing of a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. That is a "substantial, not just a conceivable likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). Petitioner fails to show a substantial likelihood that if trial counsel introduced records showing Petitioner received phone calls at the time in question, the outcome of his trial would have been different. Therefore, Petitioner's § 2255 Motion is denied as to this claim.

### E.  Ground Five: Ineffective Assistance of Trial Counsel, Failure to Request *Jencks*[4] Materials

In his final claim of ineffective assistance of counsel, Petitioner argues that trial counsel failed to request that "obvious Jencks materials be provided to the defense." (Moving Br. at 31-34.) Petitioner argues that trial counsel's sentencing memorandum shows that he failed to review the "audio files of the dispatch recordings of the transmissions and discussions of some of the officers who were at the scene or nearby" until after trial. (*Id.* at 32-33.) Petitioner claims that, had counsel reviewed the audio files, he would have realized Detective Ellis' radio communications were missing. (*Id.* at 33-34.) Petitioner argues that trial counsel was ineffective in failing to request Detective Ellis' oral communications. (*Id.* at 40.)

---

[4] *Jencks v. United States*, 353 U.S. 657 (1957).

The Jencks Act requires the Court, upon defendant's motion and "after direct examination of a government witness, to order the United States to produce to the defense 'any statement . . . of the witness in [its] possession . . . which relates to the subject matter as to which the witness has testified.'" *United States v. Ramos*, 27 F.3d 65, 69 (3d Cir. 1994) (quoting 18 U.S.C. § 3500(b)). The Jencks Act defines a "statement" as

> (1) a written statement made by said witness and signed or otherwise adopted or approved by him; (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e)(1)-(3).

Petitioner's argument that trial counsel only reviewed the audio files after trial is unsupported by the record. Petitioner cites to trial counsel's sentencing memorandum, where trial counsel explained "as a result of the March 19, 2019 . . . letter to Judge McNulty by [Williams] I again reviewed the Government's discovery packet" which included the audio files. (Moving Br. at 40.) Petitioner argues this proves trial counsel failed to review the audio files prior to trial. But trial counsel explicitly indicated he *again* reviewed the discovery packet *after* trial. Petitioner's contention is thus unsupported by the record.

Furthermore, Petitioner has failed to show trial counsel was ineffective for not requesting Detective Ellis's audio files pursuant to the Jencks Act. At trial, Detectives Ellis and Ryals testified that Detective Ellis' communications with the other officers were not recorded. Detective Ellis explained his communications were sent through a "direct" channel officers "use on the radio so no one with radio scanners can listen to the transmissions." (Trial Tr. at 157:19-20.) Detective Ellis explained they do not record anything on "direct." (*Id.* at 218:4-5.) Detective Ryals testified that

Detective Ellis' calls were not recorded because they were on a "direct channel." (*Id.* at 289:21-24.) Trial counsel cannot be ineffective for failing to request materials that do not exist.

Furthermore, Petitioner makes no showing as to how requesting and receiving the Jencks statements would have in any way affected the outcome of his trial. Therefore, Petitioner has also failed to show he was prejudiced by trial counsel's alleged failure. *See*, *e.g.*, *United States v. Heilman*, 377 F. App'x 157, 197 (3d Cir. 2010) (prejudice as to failure to request Jencks material requires showing of how the material would have affected the outcome of proceedings). Petitioner's § 2255 Motion is denied as to this claim.

### F.  Ground Six: Ineffective Assistance of Trial Counsel, Cumulative Error

In ground six, Petitioner argues that the cumulative effect of trial counsel's failures establishes prejudice. (Moving Br. at 34-35.)

"[E]rrors that individually do not warrant habeas relief may do so when combined." *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007). "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'" *Id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Petitioner's claims cumulatively do not show prejudice. For the reasons discussed above, even considering Petitioner's claims in the aggregate, Petitioner has failed to show he was prejudiced by counsel's alleged errors, and thus cannot show ineffective assistance of counsel. As such, this claim is dismissed and Petitioner's § 2255 Motion is dismissed in its entirety.

### IV.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c)(2), a petitioner may not appeal from the final order in a § 2255 proceeding unless he makes "a substantial showing of the denial of a constitutional right."

"A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In *Slack v. McDaniel*, the United States Supreme Court further held:

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

529 U.S. 473, 484 (2000). Here, based on the contents of the Petition presented, the Court finds that jurists of reason would *not* find it debatable whether the petition states a valid claim of the denial of a constitutional right *or* whether this Court was correct in its procedural ruling. Consequently, the Court will not issue a certificate of appealability.

## V.    CONCLUSION

For the reasons stated above, Petitioner's Amended Section 2255 Motion (ECF No. 1) is **DENIED** *without prejudice*. A certificate of appealability shall not issue. An appropriate Order follows.

**Dated: 12/15/2025**

HONORABLE JULIEN XAVIER NEALS
United States District Judge